**Bonnie June HAMRIC, Petitioner,**

v.

**June R. BAILEY, Superintendent of the West Virginia State Prison for Women, Respondent.**

**No. 3562.**

United States District Court
S. D. West Virginia,
Charleston Division.

Feb. 8, 1967.

Jackson, Kelly, Holt & O'Farrell, by Homer A. Holt, Charleston, W. Va., for petitioner.

C. Donald Robertson, Atty. Gen., of West Virginia, and Fred M. Frisk, Jr., Asst. Atty. Gen., Charleston, W. Va., for respondent.

### OPINION

FIELD, Chief Judge.

Claiming that her rights under federal constitutional concepts of due process

were violated, the petitioner in this proceeding seeks relief from her conviction of second degree murder in the Circuit Court of Jackson County, West Virginia. Judgment of conviction was entered by that court on March 15, 1965, and petitioner was sentenced for a period of five to eighteen years and is presently confined pursuant to said sentence in the West Virginia State Prison for Women at Pence Springs in Summers County in this federal judicial district.

The petition was filed on January 5, 1967, and a show cause order was entered on that date, copies of the order having been served upon both the respondent and the Attorney General of the State of West Virginia. An answer was filed on behalf of the respondent by the Attorney General which answer denies that any federal constitutional rights of the petitioner were violated during the course of her trial and conviction and also avers that the petitioner has failed to exhaust available state remedies as required by 28 U.S.C. § 2254.

The facts material to the disposition of the issues presented in this proceeding may be briefly stated as follows: On the night of September 7, 1964, Glenn Winters was struck with a charge of shot from a shotgun and thereafter died on the 20th day of September, 1964. On January 4, 1965, petitioner was indicted by a grand jury of Jackson County, West Virginia, the indictment charging her with murder of Winters in the first degree. Her trial and subsequent conviction of which she now complains followed as hereinbefore set forth.

It was not denied that petitioner fired the shotgun which resulted in the death of Glenn Winters, but the circumstances surrounding the shooting were, of course, of the utmost importance in the determination as to whether the homicide was justifiable or, if not justifiable, to what degree petitioner was criminally responsible under the laws of the State of West Virginia.

The evidence disclosed that the petitioner was sitting in a small room on the first floor of her home watching television, her two young children having gone upstairs to bed at the time. The room had one window which was unlocked, the window being covered on the inside of the room by a metal Venetian blind and draw drapes, both of which were closed. Shortly after nine o'clock petitioner heard a noise at the window as though the window was being slowly raised, and upon calling out she received no answer. She thereupon called her children and went with them to the home of her mother across the street and from there called the office of the Sheriff of Jackson County in an attempt to reach her husband. The petitioner's mother, her husband and the city police came to her home and after staying awhile and investigating the premises they departed. However, before petitioner's husband left the house he obtained a 12-gauge shotgun and proceeded to instruct the petitioner as to the manner in which the same might be loaded. The petitioner did load the shotgun and again sat in the room to watch television. The children returned to bed upstairs.

Thereafter at about 11:30 p. m., petitioner heard the Venetian blind and draperies moving and testified that she became extremely frightened. She thereupon got out of her chair, took the shotgun and fired in the direction of the window. The shotgun charge went through the draperies and Venetian blind and continued through the window partly at the top of the bottom sash and partly through the glass just above the sash. The alignment of the hole made by the charge through the drapery, blind and window indicated that the window was raised an estimated three to five inches at the time the shot was fired. Following the shooting the authorities were called and an examination outside the window indicated that wood and glass were upon the ground outside the house for a distance of some three feet. The victim, Winters, was found by an ambulance driver near the side of a trailer occupied by him which was located at the rear of a lot adjacent to the petitioner's home. Incidentally, it was undisputed

that after he was shot the victim called by telephone for the ambulance from his trailer. The ambulance driver was permitted to testify that he found the victim near the side of his trailer and that when he asked the victim where he was standing when he was shot, Winters pointed toward the carport at the rear of the Van Winkle house and said, "Right there in my yard." The court permitted this testimony of the ambulance driver as to the statement made by the victim at that time to come in under the theory that it was either part of the res gestae or, in any event, qualified as a dying declaration. The court also permitted testimony of a statement made by the victim in the presence of witnesses in his hospital room at Charleston on September 13, 1964, some seven days before his death. This statement was to the effect that the victim was "on his side of the hedge or fence" at the time he was shot. Although this statement was made some seven days prior to Winters' death, it likewise was admitted as a dying declaration.

The position taken by the petitioner at the trial was that at the time she fired the fatal shot, she was shooting at a person unknown to her who was immediately outside the window of her home or in very close proximity thereto. On the other hand the position taken by the state was that the victim was standing at a point some 27 feet distant from the window of the petitioner's house at the time he received the fatal shotgun charge.

As hereinbefore stated, upon these facts the jury convicted the defendant of second degree murder. The trial court overruled a motion to set aside the verdict and thereafter petitioner filed a petition for a writ of error and supersedeas in the Supreme Court of Appeals of West Virginia and the writ was allowed by that court on November 1, 1965. The Supreme Court affirmed the conviction and a rehearing was denied. The opinion of the Supreme Court is reported sub nom. State v. Hamric, 151 W.Va. ——, 151 S.E.2d 252.

The record as filed in the Supreme Court of Appeals of West Virginia was filed as an exhibit in this proceeding, and I advised counsel that it appeared to me that the issues raised by the petition might all be disposed of on the record as submitted without the necessity of an evidentiary hearing. However, I did grant to either the petitioner or respondent the opportunity to file any relevant material or to introduce oral testimony at the hearing held herein on January 30, 1967. At that time the respondent was permitted to present the testimony of the following witnesses: Stanley E. Preiser, Esquire, who had been employed by the family of the victim as a special prosecutor in the trial of this case; Alvin Hunt, Esquire, who was prosecuting attorney at the time of the homicide and who assisted in the prosecution of the case; O. G. Britton; Robert L. Casey; Sergeant R. F. Langley and Lieutenant R. J. Barber; all of whom were members of the West Virginia Department of Public Safety at the time of the investigation of the homicide.

■ In disposing of this petition it is necessary that I deal first with the contention of the respondent that petitioner has failed to exhaust her available state remedies as required by 28 U.S.C. § 2254. The exhaustion of such remedies is, of course, a prerequisite to jurisdiction of this court to entertain this petition, and counsel for respondent suggest that this aspect of the case should be controlled by Judge Maxwell's opinion in the case of Miller v. Boles (N.D.W.Va.1965) 248 F.Supp. 49. The far-reaching principles set forth in Fay v. Noia (1963) 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, indicate to me that I should not summarily reject the petition in the present case. This conclusion seems to have been recognized by Judge Maxwell in his exhaustive opinion in the *Miller* case wherein he indicated that a state prisoner might well satisfy the provisions of Section 2254 by alleging in the petition that the claim urged in the federal court was determined at his criminal trial and asserted

as reversible error in his application for writ of error. While arguably the constitutional aspects of the petitioner's claim might not have been asserted in the original application for writ of error, they undoubtedly were in the petition for rehearing which was denied by the Supreme Court of Appeals. Under the circumstances, I do not believe that the law requires that she once again run the full gamut of the state procedural channels even assuming that such channels are theoretically available to her. This was recognized in the Fourth Circuit case of Grundler v. State of North Carolina (1960) 283 F.2d 798, wherein the court stated, in effect, that if the petitioner's issues had been presented and adjudicated by the highest court of the state on one occasion, it was not necessary that he urge the same questions upon them a second time under some alternative procedure. Such would seem to be the case at hand and for this reason it is my opinion that the petitioner has the standing to seek federal relief at this point.

The petitioner contends that she was denied a fair trial and deprived of her rights under the due process clause of the Fourteenth Amendment to the Constitution of the United States in the following respects:

(1) The suppression by public officers of the State of West Virginia and prosecuting counsel of evidence, known to them but not known to counsel for the petitioner until after the jury had retired to consider its verdict, which evidence was vital to the petitioner's defense; and

(2) The calculated and persistent asking by prosecuting counsel of witnesses and of the petitioner, upon cross examination, of questions which were highly prejudicial in their implications and for which no foundation was laid nor existed, with the intentional wrongful purpose of influencing the jury verdict regardless of the guilt or innocence of the petitioner.

Based upon the record together with the oral testimony taken in this proceeding, the facts in regard to the alleged suppression of vital evidence by the prosecuting counsel are found to be as follows: In the early morning of September 8, 1964, a brother of the victim turned the shirt which the decedent was wearing at the time he was shot over to Trooper Britton at a Charleston hospital. Trooper Britton turned the shirt over to Corporal Casey, who thereafter gave it to Corporal (now Sergeant) Langley. Langley stated in his affidavit that on or after September 10, 1964, he examined the shirt both visually and microscopically and that near the left pocket amidst the blood he discovered two particles of broken or shattered glass, a small piece of wood and what appeared to be a flattened pellet from a shotgun shell. All of these particles were carefully saved by him and were kept in the possession of the Criminal Identification Bureau of the Department of Public Safety. There were also about the shirt what appeared visually to be fine particles of wood. This information was incorporated into a written report mailed to Corporal Casey at Ripley, West Virginia, and the information was supplied directly to the special prosecutor and the prosecuting attorney of Jackson County, West Virginia, in an oral conversation on September 30, 1964. It was suggested that the shirt be further examined by Lieutenant R. J. Barber. Barber examined the shirt, although he was not requested to do so, and while he made no specific scientific examination to determine whether there were particles of wood embedded in the shirt, he recalled that from a merely visual examination there were what appeared to be fine particles on the shirt about the region where the victim apparently had been shot. Barber was not requested to make any report of his findings.

Corporal Langley was subpoenaed as a witness for the state and appeared on the opening day of the trial which lasted four days. However, Corporal Langley was not called as a witness and apparently was excused after his first day's attendance.

In view of the testimony that the glass and wood and other debris resulting from the shotgun blast through the window of the Hamric home being found in an area limited to some three feet outside the window, and in the light of the divergent positions of the prosecution and defense as to the position or location of the victim at the time he was shot, it is quite apparent that the testimony with respect to the findings and observations of wood particles and glass on the shirt of the decedent were pivotal and vital to the petitioner in her criminal trial. The failure to introduce this testimony for the consideration of the jury becomes even more pointed in view of the fact that the special prosecutor asked two witnesses Harl Winters, brother of the deceased, and Edison Parsons, driver of the ambulance which carried the deceased from Ripley to the Charleston hospital, concerning their observations of the clothing, including the shirt of the deceased after the shooting. Winters was asked specifically by the prosecutor whether there was any wood or glass on the shirt and he answered there was not. Parsons was asked whether he observed any wood or glass on any part of the victim's clothes to which he answered that he saw none. The negative testimony of these two witnesses is the sum total of the evidence in the record which was placed before the jury on the vital issue of whether any wood or glass was, in fact, on the decedent's shirt following the shooting.

On the issue of suppression counsel for respondent contend that it was considered and resolved against petitioner by the trial court as well as the Supreme Court of Appeals of West Virginia, and suggests that in this proceeding I should accept the state courts' determination as correct. They suggest that their position in this respect is buttressed by the recent Amendment to Title 28 U.S.C. § 2254. I do not believe, however, that the Amendment upon which they rely has materially relieved this court of the obligations placed upon it as elaborated in Townsend v. Sain (1963) 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. This conclusion with respect to the impact of the Amendment was reached by a district court for the Western District of Missouri sitting en banc in the recent case of White v. Swenson (D.C., 1966) 261 F.Supp. 42.

The issue in regard to the suppressed evidence was presented to the trial court on the motion for a new trial on the ground of after-discovered evidence, and the trial court as well as the Supreme Court treated it in the light of the restrictive and somewhat inflexible rules applicable to after-discovered evidence. In the appellate opinion the court pointed out that counsel for the petitioner obtained information with respect to the evidence before the verdict was returned and that the motion should have been promptly made at that time. The court further indicated that the information might have been ascertained through the efforts of defense counsel either before or during the trial of the case; and finally, the court observed that the nature of the evidence made its materiality questionable and that it would not have affected the result of the trial. The court indicated that the only use of such evidence would appear to have been to discredit or impeach other witnesses in the case.

■ In my opinion, however, in the present proceeding the issue in regard to this evidence is not to be considered within the narrow confines of after-discovered evidence, but necessarily must be considered in the broad context of federal due process. That the question rises to the level of constitutional due process is now well settled in the light of Brady v. State of Maryland (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215, wherein the Court held that the suppression of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, and this irrespective of the good faith of the prosecution.

Appraised in this light, the constitutional rights of the petitioner should not be lightly disposed of merely by pointing

out possible channels of discovery of the evidence which were theoretically available to counsel before or during the trial. As Judge Sobeloff stated in Barbee v. Warden, Maryland Penitentiary (4th Cir. 1964) 331 F.2d 842: "In gauging the nondisclosure in terms of due process, the focus must be on the essential fairness of the procedure and not on the astuteness of either counsel."

Indeed, the pattern of the trial in petitioner's case is not dissimilar to that considered in the *Barbee* opinion. In the present case, on the pivotal issue of the physical location of the victim at the time he was shot, the prosecution presented two witnesses who testified that there was no significant debris on the victim's shirt after he was shot. As hereinbefore pointed out this was the only evidence on this point presented to the jury although the prosecution well knew at the time that there was, in fact, evidence to the contrary. With all deference to the able Judge who wrote the opinion on the direct appeal, I do not believe that the evidence which the prosecution failed to disclose was of "questionable value" or that it would not have affected the result of petitioner's trial. Again, it occurs to me that the language of the opinion in the *Barbee* case is appropriate:

"* * * In the present case, where evidence was withheld by the police which had a direct bearing upon and could reasonably have weakened or overcome testimony adverse to the defendant, we will not indulge in the speculation that the undisclosed evidence might not have influenced the fact finder. 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' * * Involved is a question of fundamental fairness rising to the level of constitutional due process which cannot be brushed aside as a mere error in an evidentiary ruling."

At the hearing on this petition, the special prosecutor and other witnesses testified that they had discussed the possibility of putting Langley's testimony before the jury but concluded that since he was unable to give an opinion as to the source of the glass or wood the evidence would probably he held to be inadmissible and that it was for this reason they did not proffer it at the trial. Assuming that this testimony demonstrates the good faith of the prosecution, in my opinion it does not constitute a valid reason to disregard the constitutional rights of the petitioner. In Griffin v. United States (1950), 87 U.S.App. D.C. 172, 183 F.2d 990, the court succinctly stated the principle as follows:

"[T]he case emphasizes the necessity of disclosure by the prosecution of evidence that may reasonably be considered admissible and useful to the defense. When there is substantial room for doubt, the prosecution is not to decide for the court what is admissible or for the defense what is useful."

■ It is my conclusion that the manner in which the evidence with respect to the decedent's shirt was presented to the jury by the prosecution without the disclosure of the evidence of Langley and Barber constituted a denial of constitutional due process to the petitioner in her trial and for that reason the writ of habeas corpus should issue subject to the right of the state to retry the defendant within a reasonable time should it so elect.

In view of my disposition of the suppression issue, it is unnecessary for me to pass on the second contention of petitioner.

Counsel may tender for entry an appropriate order incorporating this opinion by reference therein.