**UNITED STATES of America ex rel. Joseph HUGHES, Petitioner-Appellant,**

v.

**Hon. Daniel McMANN, Warden of Clinton Prison, Dannemora, New York, Respondent-Appellee.**

**No. 70, Docket 31461.**

United States Court of Appeals Second Circuit.

Argued Sept. 20, 1968.

Decided Nov. 14, 1968.

Peter S. Paine, Jr., New York City (Anthony F. Marra, The Legal Aid Society, New York City), for petitioner-appellant.

Hillel Hoffman, Asst. Atty. Gen. (Samuel A. Hirshowitz, First Asst. Atty. Gen., on brief) (Louis J. Lefkowitz, Atty. Gen., of the State of New York), for respondent-appellee.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

Joseph Hughes, convicted of felony murder by a New York court in 1958, has sought federal habeas corpus because of the receipt in evidence at his trial of two written confessions alleged to have been involuntary.

The indictment was for causing the death of Spinaci, the proprietor of an Italian delicatessen store, who was wounded during a robbery in Buffalo, N. Y., and later died. No objection was made to the admission of the confessions at the trial. The jury convicted of felony murder with a recommendation of life imprisonment; the judge sentenced Hughes to death. On appeal to the New York Court of Appeals the question of the voluntariness of the confessions was raised for the first time; the court affirmed without opinion, People v. Hughes, 6 N.Y.2d 839, 188 N.Y.S.2d 222, 159 N.E.2d 704 (1959). Governor Rockefeller later commuted Hughes' sentence to life imprisonment.

■ After the decision in Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), Hughes petitioned the state court for *coram nobis* and was granted a hearing before a Justice of the Supreme Court for Erie County pursuant to People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).[1] The facts found by him or established by uncontroverted testimony are as follows:

Hughes was arrested on November 21, 1957, the day after the robbery, and was taken directly to Buffalo Police Headquarters. He is a Negro, then twenty-one years old, with only a fifth-grade education; he had been sent three times to reform school. His home was in Jamestown, N. Y.; he had been in Buffalo about a week and was unemployed. At the police station he was questioned intermittently by three to five police officers for a period of not more than an hour. Four officers then took him to a hospital where Spinaci was in serious condition, sustained by tubes and plasma bottles. Sparcino, an Italian-speaking ambulance driver, consulted with the wounded man but apparently was unable to obtain a positive identification; an episode occurred during the hospital visit about which we shall have more to say below. Hughes was then returned to police headquarters between midnight and 12:20 A.M. on November 22 and was questioned by the District Attorney of Erie County; the questions and answers were taken down by typewriter and signed. The questions, which were asked slowly so that the typist could record the conversation,

---

[1] Since the state courts have entertained Hughes' federal claim, we have no occasion to consider the effect of the lack of objection at trial. See Irvin v. Doud, 359 U.S. 394, 405–406, 79 S.Ct. 825, 3 L.Ed. 2d 900 (1959); cf. Home Ins. Co. v. Dick, 281 U.S. 397, 407, 50 S.Ct. 338, 74 L.Ed. 926 (1930).

give no evidence of pressure, and the answers are natural and circumstantial. Hughes was then placed in a cell; this was about 1:30 A.M. according to uncontroverted police testimony.

Arraignments in Buffalo were customarily held commencing at 2 P.M. Hughes was again questioned about 2:15 P.M. by a desk lieutenant. A short narrative statement was taken, which Hughes signed about 2:55 P.M. He was then arraigned on a charge of robbery.

Hughes testified that, in the course of his initial questioning before being taken to the hospital, and again after his return, he requested and was denied the use of a telephone to call his sister in Jamestown, to ask her to try to get a lawyer for him. Four police officers testified they did not recollect any such request; the testimony of two went further, indicating belief that no request had been made. One officer said the practice was to allow a person under interrogation to make one telephone call, but another was not sure that this applied to long-distance calls.[2] The state court found that "neither the police nor the District Attorney advised defendant that he was under no compulsion to make a statement or that he was entitled to the aid of counsel." Hughes also testified without contradiction that he was not advised that anything he said might be used against him. Although Hughes alleged many instances of abusive language and threatening gestures—but not physical violence—by police officers and an offer of leniency by the district attorney, all this was categorically denied, and the state judge found "there was no force or fear employed by the District Attorney or other officers involved in the taking of either statement."

The state judge concluded that "the People have sustained the burden of proof on the issue of voluntariness, and the proof establishes beyond a reason-able doubt that the defendant's will was not overborne and that the statements \* \* \* were voluntarily and freely given." Accordingly he denied *coram nobis.* This ruling was affirmed without opinion, People v. Hughes, 25 A.D. 2d 720, 269 N.Y.S.2d 964 (4th Dept. 1966), and Judge Fuld denied leave to appeal to the Court of Appeals on May 17, 1966.

Noting that all these actions by the state courts ante-dated Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), and Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), Judge Foley thought the New York courts should have an opportunity to reconsider the case in light of these Supreme Court decisions and dismissed the application for habeas corpus without prejudice. He granted a certificate of probable cause; we gave leave to appeal *in forma pauperis* and assigned counsel.

■ Hughes manifests no desire to resort again to the New York courts. This is understandable since he would have scant prospect of success. New York has not chosen "to effectuate \* \* stricter standards" than those laid down in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and *Miranda,* or "to apply those standards in a broader range of cases than is required by this decision." Johnson v. New Jersey, supra, 384 U.S. at 733, 86 S.Ct. at 1781; see People v. McQueen, 18 N.Y.2d 337, 342, 274 N.Y.S.2d 886, 889, 221 N.E.2d 550 (1966); People v. Horton, 18 N.Y.2d 355, 275 N.Y.S.2d 377, 221 N.E.2d 909 (1966). Davis v. North Carolina announced no novel doctrine; it merely applied the test of voluntariness that had gradually evolved since Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936). We see no reason why Hughes should

---

2. The attorney who represented the defendant on appeal testified that when he interviewed Hughes in Sing Sing Prison, Hughes told him he had asked to call his sister in Jamestown but had been told the Police Department did not allow long distance calls.

be put to a further journey through the New York courts that will almost certainly be futile; he is entitled to have his claim passed upon by a federal court without further ado.

If the case could be properly disposed of upon the points on which it was argued, we would nevertheless affirm the denial of the writ. Hughes makes none of the attacks on the factual determinations of the state court that are enumerated in 28 U.S.C. § 2254(d), which in the main codified Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). See White v. Swenson, 261 F.Supp. 42 (W.D.Mo.1966) (in banc); Hamric v. Bailey, 274 F.Supp. 240 (S.D. W.Va.1967). His claim was rather that the facts as found called for a legal conclusion on the voluntariness of the confession opposite to that reached by the state judge—an issue on which we are as able to pass as the hard-pressed District Court for the Northern District of New York.

■ The legal issue, as the Supreme Court has frequently instructed, "is whether the defendant's will was overborne at the time he confessed." See Lynumn v. Illinois, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (opinion of Mr. Justice Frankfurter). The test "has become increasingly meticulous through the years," Johnson v. New Jersey, supra, 384 U.S. at 730, 86 S.Ct. at 1779, and old cases upholding confessions, even Supreme Court cases not expressly overruled, are hence of little assistance.

■ The bases urged upon us to show that Hughes' "will was overborne" are the lack of warnings and the alleged refusal to allow him to telephone his sister. While the Court has made clear that failure to advise the accused of his privilege against self-incrimination is a factor to be taken into account in passing on the voluntariness of a confession, this alone can hardly be sufficient. If it were, the promise of Johnson v. New Jersey that Escobedo and Miranda would not be applied so as to "seriously disrupt the administration of our criminal laws," 384 U.S. at 731, 86 S.Ct. at 1780, would be an empty one. Even when we add the alleged refusal to allow Hughes to call his sister, Hughes' case is some distance from the most recent decisions of the Court invalidating confessions as involuntary: Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) [prisoner kept in dark detention cell for 16 days without seeing anyone and with notations on arrest sheet that no one was to be allowed to see him and that he was not to be allowed to use telephone; no advice of rights; extremely limited food; daily interrogation sessions]; Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) [prisoner first confessed 38 hours after arrest when he "had had little sleep and very little food, and appeared to the police to be sick" and had consistently denied guilt; confessed again three days later after he had been "detained in at least three different police buildings," apparently had "had very little to eat and little contact except with policemen," and had still denied guilt; confessed third time five days later when he had not yet seen counsel]; Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L. Ed.2d 77 (1968) [prisoner confessed thirteen hours after arrest, without food or medication required for high blood pressure; apparently lacked sleep; no warnings; request for lawyer ignored; denial of guilt]; Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) [prisoner held incommunicado for 30 to 48 hours despite three requests to communicate with outside world and numerous attempts by his lawyers to communicate with him and issuance of a writ of habeas corpus; after each of these confessions prisoner recanted and resumed persistent denial of guilt].

As far as these two elements go, the decision most favorable to Hughes is Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), where the Court held involuntary a written confession signed some 16 hours after an evening arrest. The Court accepted Haynes' testimony that he was told "he might call his wife only if he 'cooperated' and gave the police a statement"—indeed that he was held incommunicado and not allowed to call her for five or seven days after his arrest. Haynes, like Hughes, had not been advised of his rights. Id. at 509–511, 83 S.Ct. 1336. But there is a significant distinction between the cases, in addition to the longer time interval in *Haynes*. What made Haynes' confession involuntary in the view of the majority was not simply his incommunicado detention but the threat that the police would continue this until Haynes did what they wanted of him; confession, in other words, was made the price of access to his family. Even on Hughes' version there was nothing of that sort here. There is nothing to indicate that the Buffalo police would not have caused Hughes to be arraigned early in the afternoon of November 22 whether he had confessed or not, or that they said anything that might have led Hughes to doubt this. While Hughes may not have known that he would be promptly arraigned, even this was not proved. Moreover, we know of no holding that such ignorance plus denial of the use of a telephone and absence of warnings require a conclusion that a confession was involuntary.

What we find troubling about the case is another point which is disclosed by the record but has not been fully developed. Sparcino testified at the trial, without objection, that during the confrontation at the hospital, "I asked Mr. Hughes if he would point the gun at Mr. Spinaci,

and asked him if he would repeat what he said in the store, and he said, 'This is it. Scoop it up.'" Cross and redirect examination brought out that two or three minutes later Hughes looked at the gun and said "What are you doing to me?"[3] At the *Huntley* hearing Hughes testified that Sparcino "tried to put the gun in my hands" and said "Say what you said in the store." He continued that he made a statement but didn't recollect what it was; a conference with counsel refreshed his recollection that he had exclaimed "What are you doing to me?" He evidently did not understand he was being asked what he had said on the reenactment.[4]

What seems not to have been sufficiently appreciated is how far Hughes' statement in course of the reenactment differed from the common police practice of instructing a prisoner to utter in the presence of a witness words recalled by the latter as having been spoken at the scene of the crime, see United States v. Wade, 388 U.S. 218, 220, 222–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). Parroting of that sort carries no admission of guilt. Here, by acceding to the request to repeat what was said in the store—something known to the perpetrator of the crime but apparently not to the police—and doing this in a highly incriminating fashion, Hughes then and there confessed. If this was involuntary, both the confession made only an hour later and the statement of the next afternoon were fatally infected. Clewis v. Texas, supra, 386 U.S. at 710–712, 87 S.Ct. 1338; Beecher v. Alabama, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967); Darwin v. Connecticut, supra, 391 U.S. at 349, 88 S.Ct. 1488.[5]

The present record is insufficient for a satisfactory determination whether the hospital statement was involuntary.

3. Apparently more was said, but the trial judge limited the testimony to these two statements.

4. In the statement taken by the District Attorney, Hughes described the episode in the store by saying that when Spinaci

had turned to get some article, Hughes drew his gun and said "Just the cash." Spinaci threw a bottle, and Hughes fired.

5. Of course the hospital statement would also have been inadmissible, but there is no need for considering this.

As indicated, the matter was dealt with only tangentially in the *Huntley* hearing. There is indeed much to suggest that this uneducated young Negro in a strange town, given no warning of his right to remain silent, rebuffed in one request for access to a telephone—as we believe the evidence shows—and surrounded by police officers in a hospital bedroom in the dead of night, would not have thought he could refuse to comply. On the other hand, there is nothing to indicate either force or the threat of it, and most of the testimony was that Sparcino, who did not testify at the *Huntley* hearing, used words of request and not of command. The case thus seems to fall under the "final category" of Townsend v. Sain, supra, 372 U.S. at 317, 83 S.Ct. 745, where the state court has not reliably found all the relevant facts—in this case very likely because it was not asked to. See also 28 U.S.C. § 2254(d) (3).

We therefore reverse the order denying the writ and remand the case with instructions to Judge Foley to hold an evidentiary hearing as to the episode in the hospital room and then to render an appropriate judgment.

The court is indebted to Peter S. Paine, Jr., Esq., for his services as assigned counsel on Hughes' behalf.

MOORE, Circuit Judge (concurring):

Although I acquiesce in the remand to Judge Foley, I do so only on the theory that all court decisions should be based upon as full and accurate factual foundations as possible. Referring to the hospital room incident, Judge Foley himself said: "This incident may need further legal exploration and explanation."

As Judge Foley has said: "In the past we [the district court] reviewed the original trial record to fulfill the duty of independent examination of the involuntariness claim." His fear that "now there will be necessity to canvass and examine both the trial record and the post conviction hearing record" is probably well-founded.

Judge Foley's thought "that the State Courts should have first chance to review alleged errors under new rulings, and the opportunity to recanvass in the interests of comity should be afforded even if there is doubt reconsideration will be entertained" is in accord with my views. And were it assured that federal courts would evidence that respect for the decisions of the highest State courts that comity should command, I would follow Judge Foley's "without prejudice" decision and affirm. However, as he so well knows, there would be no finality were this course pursued and he would only be faced with the same problem at a later date.

I do not agree with my colleagues' suppositions as to the proof. From the present record, I find no basis for the assumption that Hughes did not understand what he was being asked or as to what was the common police practice of instructing prisoners.

Finally, since the whole point of the remand is to develop the facts and permit the judge to decide the question of voluntariness in the light of such facts, I do not concur in the majority's inferences as to what Hughes might or might not have thought under the circumstances. Hughes may have been "young," "uneducated," the town may have been "strange," silence warnings may not have been given, and his long-distance phone call request been denied, but these facts *per se* do not "require a conclusion that a confession was involuntary" or negate voluntariness. As to the incident in the hospital room, I do not give it the significance which my colleagues seem to attach to it. Even as to this incident they say that there was no force or threat and that Sparcino "used words of request and not of command." These, of course, are factors to be considered but again by the trial court on remand—not by us.