UNITED STATES ex rel. Jack JAMES,
Petitioner,

v.

Harold W. FOLLETTE, Warden, Green
Haven Prison, Stormville, New York,
Respondent.

No. 68 Civ. 5011.

United States District Court
S. D. New York.

June 26, 1969.

Peter L. Maroulis, Poughkeepsie, N.
Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen. State
of New York, New York City, for re-
spondent; Michael Jaffe, Asst. Atty.
Gen., of counsel.

EDWARD WEINFELD, District Judge.

Petitioner, currently serving a twenty to twenty-five year sentence at the Green Haven state prison following his conviction after trial by jury for kidnapping, seeks his release upon a federal writ of habeas corpus.[1] He charges that his conviction was unconstitutionally tainted by the admission into evidence of his station house identification by Carl Moody, the kidnapping victim, two months after the event. Specifically, petitioner alleges that at the station house Moody at first did not identify him, but after an interval thought petitioner might be his assailant; that Moody then added he would like to see petitioner freshened up, wearing a hat and hear him speak the word "levelling," an expression one of his two kidnappers had used. Thereupon petitioner alleges he was required to wash his face, comb his hair, put on a hat and coat, and that in response to the question, "Are you levelling with us, Jack?" petitioner answered, "Yes, I'm levelling with you," whereupon Moody positively identified petitioner as one of his two assailants. Earlier that day, one Albert Brust, following his arrest on another charge, admitted his participation in the Moody incident and named petitioner as his confederate. Brust thereafter pled guilty to the charge, but, as hereafter related, when called by petitioner as a witness at the trial, testified that another had been his associate in the crime.

The jury could have found that Brust called at Moody's home in response to a newspaper advertisement that his car was for sale; that after inspecting the car Moody and Brust got into it for a demonstration drive; that Brust, after driving a while, brought the car to a stop, pointed a gun at Moody, and within a minute petitioner appeared and opened the door of the car and also pointed a gun at Moody; that petitioner entered the car, and with Moody in the center and Brust at the wheel they travelled along Southern State Parkway about an hour where, at a given point, Brust left petitioner and Moody in the area while he went off to sell the car; that during Brust's absence Moody and petitioner walked along a public highway while petitioner had Moody covered with a gun; that Brust, having failed to sell the car, returned and picked up Moody and petitioner; that Moody was returned to his home with his car more than three hours after Brust's initial appearance there.

At the trial Moody testified that over the three-hour period he had seen petitioner clearly, observed his characteristics and heard his voice; that even though the incident occurred at night, he had ample opportunity to observe the petitioner because of gas station illumination when they stopped for gas, as well as that provided by the map light in the car, and when he struck a match, providing a light for petitioner's cigarette.

Brust, already having commenced service of his sentence, was called by petitioner as a defense witness. He acknowledged before the jury his plea of guilty to the charge, but denied petitioner had been his accomplice, who he testified was known to him only as "Bob," whose address he did not know and whom he had seen only twice, the first time a week before the holdup. Brust conceded that he had known petitioner a long time and also admitted that he had informed the police upon his arrest that his companion in crime had been petitioner and not "Bob." The jury could have disbelieved Brust, as it could have disbelieved petitioner's denial and petitioner's alibi witnesses.

Petitioner unsuccessfully pressed his claim on direct appeal to the Appellate Division, which affirmed the judgment of conviction without opinion,[2] and to the Court of Appeals, which affirmed with-

---

1. The petitioner also served concurrent terms of 5 to 10 years for first degree assault and gun possession as a felony.

2. People v. James, 280 App.Div. 983, 116 N.Y.S.2d 497 (2d Dep't 1952).

out opinion.[3] An application for a writ of error coram nobis, based upon Moody's alleged perjurious testimony, was denied in March, 1960, in the Queens County Court, the order of denial was affirmed by the Appellate Division,[4] and the Court of Appeals denied leave to appeal.

Petitioner has sought the federal writ twice before. In 1963, he raised as his primary contention the claim that the testimony of the complaining witness was so filled with inconsistencies appearing on the face of the record as to compel a conclusion of perjury. Judge Palmieri, in dismissing the petition, concluded that the jury could have found the witness positive of his identification and confused as to certain details, without thereby raising a reasonable doubt of petitioner's guilt, let alone a suggestion that the witness had perjured himself. Petitioner also claimed that as a direct result of a lengthy delay before arraignment, he was identified without the benefit of a lineup. Judge Palmieri rejected this claim as "without merit" and "not ris[ing] to the status of a claim of constitutional deprivation."[5]

One year ago petitioner brought a second application for the writ, this time making the charge that forms the basis of the present petition: that at the station house the complainant at first could not identify petitioner, but identified him only on the second attempt, after improper police conduct designed to persuade Moody that they had the guilty party. The essence of petitioner's charge was that Moody perjured himself, and the State knowingly sponsored perjury by suppressing the fact that Moody had at first said petitioner was not the man. Judge Palmieri, assuming that petitioner must have conveyed these matters of first-hand observation to his trial counsel, concluded, first, that at trial Moody neither said nor implied that he had identified petitioner on the initial confrontation, and second, that counsel deliberately by-passed inquiry into the first confrontation after the trial court warned him about "opening the door."[6] This Court has reviewed the entire trial minutes, which demonstrate beyond question the correctness of Judge Palmieri's determinations.

The present application is a renewal of the earlier charges rejected by Judge Palmieri, but in different garb. Petitioner justifies his renewal on the basis of alleged newly discovered evidence. This evidence, he says, is contained in the report, hitherto unavailable to him, of his state parole officer, who was present at the station house identification. A report, which is dated about a week after the station house confrontation, appears as an exhibit to the affidavit of petitioner's counsel. In relevant portion it states:

"Present at the 105th squad at this time also was the complainant, Mr. Moody, who had already seen the parolee [petitioner]. Mr. Moody stated that he was quite sure that this was the second individual who had walked him along the road in Nassau County. Mr. Moody stated that the voice, cheek bones and carriage were the same but that he would like to see the subject washed up and dressed in the herring bone coat which Lt. Sloan had previously taken from the subject's home.

"Mr. Moody made a special point of asking whether the subject could not be induced to use the word 'level' or 'leveling' [,] a word which the individual who had taken him out of the car had used very frequently.

"On the request of Lt. Sloan, the parole officer got the subject into conversation concerning his acquaintanceship with Brust, and in conjunction with Lt. Sloan, finally managed to have the subject use the above

---

3. 305 N.Y. 770, 113 N.E.2d 157 (1953).

4. People v. James, 15 A.D.2d 961 (2d Dep't 1962).

5. United States ex rel. James v. Fay, 63 Civ. 3647 (S.D.N.Y. Feb. 8, 1964).

6. United States ex rel. James v. Fay, 68 Civ. 2761 (S.D.N.Y. July 9, 1968).

mentioned words. Thereupon, without any hesitation Mr. Moody, who was on the far end of the room, sprang up and stated that he was positive that this was the individual who had assisted in his being held up."

■ The parole report in no way supports petitioner's charges. It does not corroborate the claim that Moody at first failed to identify petitioner as the guilty party; to the contrary, it brings to light the additional information, not previously in the record, that Moody all but identified petitioner the first time he saw him in the station house. Because the petition now before us thus fails to set forth a new ground not previously presented and determined by a federal court, it may be dismissed with prejudice, without consideration of the merits, provided that the ends of justice would not be served by further inquiry.[7] Justice does not require such further inquiry.

■ The station house confrontation was not unlawful per se. While a one-to-one identification setup between suspect and witness has now been questioned,[8] each case must turn upon its own facts in determining whether the procedure was so unfair as to amount to a denial of due process. Considered against the "totality of the circumstances surrounding" the confrontation,[9] it cannot be said that the identification procedure in this instance was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification,"[10] and to constitute a denial of due process. To the contrary, the record indicates a sin-

cere purpose on Moody's part to exclude any probability of error and to assure certainty of identification, and an absence of suggestiveness by the investigating officers. It was Moody who asked if petitioner could not be "induced" to utter the word "level" or "levelling."

The fact, if it be true, that the interrogating officers, in response to Moody's request, engaged petitioner in conversation which resulted in his using the phrase "I am levelling with you," does not alter the result. Simple parroting of a word or phrase recalled by the witness as having been spoken at the scene of the crime carries no admission of guilt.[11] In such circumstances petitioner's statement was not an extraction of an admission of guilt from his own lips, but a non-testimonial utterance for identification purposes only.[12]

This is no case of identification by a victim who had but a fleeting glimpse of his assailant. Here the victim had more than ample opportunity over an extended period to observe his assailant. Moody was in the company of petitioner for more than three hours during which he conversed with him and had repeated opportunities to observe him face to face. As Moody testified, he had a clear view when the car was being filled with gas at a station that was "very well illuminated," and there saw both petitioner and Brust, his other assailant, "very clearly," and, as he further testified, prior thereto he "had seen Mr. James clearly three times. * * *" The first occasion was when petitioner entered the car and Moody saw him "face to face when the door

7. 28 U.S.C. § 2244(a).

8. Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

9. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967 (1967).

10. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); cf. Biggers v. Tennessee, 390 U.S. 404, 408, 88 S.Ct. 979, 19 L.Ed.2d 1267 (1968) (Douglas, J., dissenting);

United States ex rel. Rutherford v. Deegan, 406 F.2d 217, 219 (2d Cir. 1969).

11. United States v. Wade, 388 U.S. 218, 222–223, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); United States ex rel. Hughes v. McMann, 405 F.2d 773, 777 (2d Cir. 1968).

12. Schmerber v. California, 384 U.S. 757, 763–764, 86 S.Ct. 1826, 16 L.Ed.2d 908 & nn. 7–8 (1966); cf. 8 Wigmore on Evidence, §§ 2263, 2265 at 378, 396 (McNaughton ed.1961).

opened up." As he put it, "I turned around and looked to see who was getting into the car, and I looked at him eye to eye." The next occasion was when the map light was on. Moody testified, "the map light is very brilliant and sensitive in the car," and he saw both petitioner's and Brust's "faces were very highly illuminated." Another occasion was when the car was stopped for a traffic light near a gas station, and Moody "got [a] full profile look at Mr. James's face at that time." Then there was the occasion when Moody lit a cigarette for petitioner and he "could see his face very clearly then." Moody also testified, "I saw his profile. I saw his coat. I saw his facial characters [sic]." There was also the occasion when Brust had left with the car and petitioner walked with Moody a distance of two and a half miles, during which, Moody testified, they passed used car dealers, stores, nightclubs and other well-lit places which illuminated petitioner's facial characteristics. Moreover, Moody did not seize upon the first opportunity to identify a suspect. To the contrary, the record shows that a month before he identified petitioner as his assailant, he had gone to the station house at the request of the police to view a suspect, but had not identified him.

In sum, it cannot be said that the totality of circumstances "so undermined the reliability of the eyewitness identification as to violate due process." [13]

■■ In a brief submitted by retained counsel after the application for the writ came on before the Court, petitioner raises a series of additional challenges to the legality of his detention. Aside from the fact that there is no indication they have ever been presented to the state courts, a circumstance which by itself would require dismissal,[14] they are entirely without merit and may be disposed of at this time in the interest of judicial economy.[15]

■■ The first new claim is that the prosecution suppressed four material facts, the disclosure of any one of which might have materially altered the jury's decision. The first of these is that the prosecution knew the detective who picked up the overcoat at petitioner's home was told to look for a gray or brown herringbone when in fact the coat was tan or brown, the inference being that Moody was mistaken in his identification of petitioner; this encounters the imposing objection that defense counsel himself elicited the fact of the color discrepancy on examination of his own witness. The second claim is that the prosecution failed to tell the defense that Brust had identified himself as "Mr. James" upon first meeting Moody. Here it is contended the jury could have inferred that Brust would not have used petitioner's name had petitioner in fact been his accomplice. Aside from the fact that Brust was also petitioner's witness, it is hard to see how the information alleged to have been suppressed could have helped petitioner at trial, or that the suggested inference is necessarily the only logical one; to the contrary, the use of James' name would equally justify an inference that in fact he was the confederate. The third point, that the police induced petitioner to use the word "level" or "levelling," is without substance, for the reasons indicated above. As for the fourth point, that Moody had told the police the kidnapper other than Brust was 5'10", not 5'4", as he testified at trial, defense counsel again elicited that very information in his cross-examination of a detective. The four points, whether taken together or one at a time, do not rise to any of the standards set forth in recent decisions of our Court of Appeals.[16]

---

13. Foster v. California, 394 U.S. 440, 443, 89 S.Ct. 1127 (1969).

14. 28 U.S.C. § 2254(b).

15. United States ex rel. Di Niro v. Mancusi, 298 F.Supp. 1294, 1295 n. 2 (S.D. N.Y.1969).

16. United States v. Miller, 411 F.2d 825, 830–832, (2d Cir. 1969) ; United States v. Keogh, 391 F.2d 138, 146–148 (2d Cir. 1968).

The second new claim is that the prosecutor engaged in unfair commentary in his summation to the jury. Absent a showing that the remarks were so improper as to deny petitioner a fundamentally fair trial, the claim raises no federal constitutional issue.[17]

The petition is dismissed.

---

17. Chavez v. Dickson, 280 F.2d 727, 735 (9th Cir. 1960) ; United States ex rel. Di Niro v. Mancusi, 298 F.Supp. 1294 (S.D.N.Y.1969); United States ex rel. Santiago v. Follette, 298 F.Supp. 973 (S.D. N.Y.1969) ; United States ex rel. Birch v. Fay, 190 F.Supp. 105, 107 (S.D.N.Y. 1961) ; *cf.* Buchalter v. New York, 319 U.S. 427, 431, 63 S.Ct. 1129, 87 L.Ed. 1492 (1943).