Billy GUICE and Howard Claxton, Sr., Petitioners–Appellants,

v.

Ray FORTENBERRY, Superintendent, East Carroll Parish Prison Farm, Respondent–Appellee.

No. 80–3350.

United States Court of Appeals, Fifth Circuit.

Dec. 29, 1980.

---

George M. Strickler, Jr., New Orleans, La., Samuel Thomas, Tallulah, La., for petitioners–appellants.

James Caldwell, Dist. Atty., Tallulah, La., for respondent–appellee.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This is an appeal from a denial of a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2241. In October of 1979, Billy Guice and Howard Claxton were convicted of "unlawful use of a moveable," a misdemeanor, in violation of La.Rev.Stat. Ann. § 14:68 (West 1974), which is a lesser included offense of theft under Louisiana law. *State v. Reeves*, 342 So.2d 605 (La. 1977). Each petitioner was sentenced to six months imprisonment.

Petitioners contend that their convictions cannot stand under the Equal Protection Clause of the Fourteenth Amendment because the indictments that charged them with theft were returned by a grand jury from which blacks were systematically excluded as foreman and because the grand jury that indicted them was drawn from a venire selected by a jury commission from which blacks were systematically excluded. We affirm, holding that petitioners failed

to prove a prima facie case of discrimination.

## I.

Petitioners are the police chief and assistant police chief of Tallulah, Louisiana. Both men are black. In June of 1979, petitioners were indicted by a Madison Parish grand jury for theft of $5,000. The indictment charged that petitioners took the money for their own use from a larger sum recovered by police shortly after the robbery of a grocery store in Tallulah.[1]

Petitioners were convicted by a unanimous six–member jury consisting of five women and one man, of whom two were black and four were white. The petit jury venire from which the jury was drawn contained 27 blacks and 33 whites. The testimony and stipulations in the hearings on petitioners' pretrial motions in state court to quash the indictments and jury commission[2] reveal that although the population of Madison Parish is approximately 60% black, no black had ever been appointed to be foreman of the grand jury.[3]

Under Louisiana law, the foreman of the twelve person grand jury is appointed by a state district judge. La. Code Crim.Pro. Ann. art. 413 (West 1967). The foreman is selected by the judge from the grand jury venire, id., which is randomly drawn from the general venire and consists of at least twenty but not more than 100 persons. La. Code Crim.Pro.Ann. art. 411 (West Supp. 1980). The other eleven members of the grand jury are drawn randomly from the remaining names on the grand jury venire. La. Code Crim.Pro.Ann. art. 413. The testimony adduced during the hearings on the pretrial motions in state court reflects that in Madison Parish the state district judge requires the jury commission to draw from the general venire forty names to constitute the grand jury venire and sixty names to constitute the petit jury venire. By law the general venire must consist of at least 300 names, La. Code Crim.Pro.Ann. art. 408. (West Supp.1980), but the evidence shows that in Madison Parish the jury commission is required to draw at least 600 names to constitute the general venire.

---

1. Assistant Chief Guice and a Lt. Jones happened to be in the vicinity of the robbery. They assisted the owner of the grocery store in apprehending the bandit who fled on foot with the money. Guice placed the recovered money in Jones' lap in the front seat of their patrol car. The owner was not permitted to count the money after it was recovered. Nevertheless, he testified that the bandits had taken nearly $8,000. He was sure about this because he had counted the money the night before the morning of the robbery.

   When they arrived at the police station, Guice instructed Jones to take the money and follow him. They walked into Chief Claxton's office, and Jones placed the money on Claxton's desk. As Jones was leaving the office, Claxton was thumbing through a bundle of $20 bills. The store owner waited fifteen to twenty minutes before he was allowed to view the money. After he identified the stolen money, he notified Claxton that $5,000 in twenties was missing. Jones was originally indicted for the theft apparently on evidence that the $20 bills were last seen in her possession. Thereafter, the grand jury indicted Claxton and Guice for the theft of the $5,000 in twenties based on Jones' testimony about the occurrences after the money reached the police station. The grand jury no billed the charges against Jones.

2. Since there was a full and fair hearing on the issues in the state proceedings, the district court resolved the merits of petitioners' application for habeas corpus on the basis of the state court record without the necessity of an evidentiary hearing. See, e. g., Banda v. Estelle, 519 F.2d 1057, 1058 n.1 (5th Cir.), cert. denied, 423 U.S. 1024, 96 S.Ct. 467, 46 L.Ed.2d 398 (1975) (noting that "[w]here the record of the state habeas proceeding reveals a full and fair hearing on all of the challenges raised in the petition, the district court may proceed to decision without benefit of further evidentiary hearing"); Dempsey v. Wainwright, 471 F.2d 604, 606 (5th Cir.), cert. denied, 411 U.S. 968, 93 S.Ct. 2158, 36 L.Ed.2d 690 (1973) (holding that "[w]hen a full and fair hearing has been held in state court, the district court may, in its discretion, admit into evidence the transcript of that hearing in lieu of an independent hearing").

3. Census figures for 1970 were admitted into evidence. They show that the total population in Madison Parish for that date was 15,065 persons, of whom 9,385 were black. Rounded off to the nearest whole number these figures show a breakdown of 62% black and 38% white. There was also some testimony that the percent of black residents in the parish had declined somewhat since 1970.

The general venire in Madison Parish is randomly drawn from a larger list, which attempts to include all persons in the parish who are eligible for jury service.[4] The source of this larger list consists primarily of the list of registered voters in the parish. However, there was testimony by members of the Madison Parish jury commission that they supplemented the voter registration list with names from the local telephone directory, high school annuals, and their own personal knowledge.

In response to questioning concerning the criteria used for selecting a grand jury foreman, Judge Adams, the state judge for the parish in which petitioners were indicted and convicted, testified that he attempted to appoint the best qualified person from the list of names submitted to him on the grand jury venire. He stated that he looked for a person he knew who was able to preside over the body and administer oaths, a person who was not just able to read and write, but who was articulate as well, and a person who, if necessary, would stand up to the district attorney. The judge also said he considered a person's morals when making his decision to appoint a new grand jury foreman. When asked whether he had ever found a black person with these qualities, the judge responded:

> "Yes, I've been tempted to try it. But I still in my humble opinion I pick the one that I thought was best qualified for the job and I believe that sincerely that the law gave me that right and that discretion and authority and I would have been remissed [sic] had I not used it. I don't have any scruples or feelings against appointing a black as a foreman and I'll say this, there will be blacks on there but as of this moment the ones that I have felt were the ones that were best suited were the ones that were appointed."

The jury commission in a Louisiana parish consists of five members who must possess the same general qualifications as do jurors. La. Code Crim.Pro.Ann. art. 404 A(1) (West Supp.1980). In Madison Parish, the jury commission consists of the elected clerk of court and four other members who are appointed by the judge and serve at his pleasure. La. Code Crim.Pro.Ann. art. 404 A(2). The jury commission is required to meet at least once every six months for the purpose of selecting or supplementing the general venire. La. Code Crim.Pro.Ann. art. 408 C (West Supp.1980). At each such meeting the commission is required to examine the general venire and to delete the names from that list of persons who have served as jurors since the previous selection of the general venire. La. Code Crim.Pro. Ann. art. 410 (West Supp.1980). Moreover, by rule of the Louisiana Supreme Court:

> "The jury commission shall not include in, and shall delete from, the general venire the names of those persons who have served as grand or petit jurors in criminal cases ... during a period of two years immediately preceding their selection for jury service. However, if the name of such a person is included in a general venire, that person may claim an exemption from jury service or may waive the exemption."

La.Sup.Ct.R. 25, § 4.

Prior to January 1, 1967, the jury commission in Madison Parish consisted of five members selected by the judge in addition to the clerk of court as an ex–officio member. Art. 175, 1928 La.Code Crim.Pro. When Judge Adams assumed the bench in 1963, he reappointed the same people who had served as members of the jury commission under his predecessor. At that time, the jury commission used discretion in deciding who was qualified and eligible to

---

4. La. Code Crim.Pro.Ann. art. 401 (West 1967 & Supp.1980) provides:

"In order to qualify to serve as a juror, a person must:
(1) Be a citizen of the United States and of this state who has resided within the parish in which he is to serve as a juror for at least one year immediately preceding his jury service;

(2) Be at least eighteen years of age;
(3) Be able to read, write, and speak the English language;
(4) Not be under interdiction, or incapable of serving as a juror because of a mental or physical infirmity; and
(5) Not be under indictment for a felony, nor have been convicted of a felony for which he has not been pardoned."

serve as a juror. Each member of the commission would furnish a list of eligible jurors from his area. Judge Adams testified that since he had been in office vacancies have occurred in the commission only through attrition. However, in 1967, when the law was changed to its current provision, the appointed members of the Madison Parish Jury Commission resigned. Judge Adams at that time appointed the first black to the commission. The other vacancies were filled by the reappointment of two members of the old commission, both white, and the appointment of another white. Since 1967, six vacancies have occurred on the jury commission. Three vacancies have been filled by blacks, and three have been filled by whites. Nonetheless, only one member of the four appointed commissioners has been black at any one time, and each black appointed to the commission, except the first black appointed in 1967, has filled a seat vacated by a black commissioner who resigned.[5] Therefore, petitioners contend that blacks are underrepresented on and excluded from the jury commission.

## II.

In order to show that an equal protection violation has occurred in the context of the selection of grand jury foremen,[6] the petitioners "must show that the procedure employed resulted in substantial underrepresentation of [their] race or of the identifiable group to which [they belong]." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). The Supreme Court has held that a criminal defendant must prove the following in order to establish a prima facie case of discrimination in the selection of grand jury foremen:

"The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied . . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time . . . . The method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class . . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption raised by the statistical showing."

5. When questioned whether there was any particular reason why he reserved only one slot for blacks, Judge Adams while not admitting that he reserved a slot for blacks, responded as follows:

"No. Other than when uh . . . I became Judge in 1963 my predecessor had a jury commission that was composed of five persons with serious effort given to locating them geographically across and around the parish. At that stage in time whether it be right or wrong the jury commission used discretion in deciding who was a qualified and eligible juror, so they came and furnished the names of people in their area that would be qualified to be jurors. Everything operated so smoothly in the . . . in the judiciary at that time that when I took the bench I reappointed the same members because they represented the east section, the west section, two or so from Tallulah and then maybe one in the southwest area. No complaints were had and I used them until vacancies occurred. And it's only been through attrition that there's ever been any substitution in membership. And so as we progressed and advanced somewhere along the line the law was changed whereby there was only four members on the jury commission and the clerks. So at that time, I believe that's when I saw fit to put a black on the jury commission and left some white out. And then by the same token when the Supreme Court took over the exemptions and the exclusions from jury by their rules and we had advanced to the stage that women took their part in business and law and we put a woman on there. And so I guess it's . . . the best explanation is just as things developed there was . . . as the vacancies occurred there was some effort to include all the additional groups."

6. In view of our disposition of this case, we assume without deciding that racial discrimination with regard to the selection of only grand jury foremen requires a subsequent conviction to be set aside, "just as if the discrimination proved had tainted the selection of the entire grand jury venire." *Rose v. Mitchell,* 443 U.S. 545, 553 n.4, 99 S.Ct. 2993, 2998 n.4, 61 L.Ed.2d 739 (1979); *Williams v. Mississippi,* 608 F.2d 1021, 1022 (5th Cir. 1979).

*Rose v. Mitchell*, 443 U.S. 545, 563, 99 S.Ct. 2993, 3005, 61 L.Ed.2d 739 (1979) (quoting *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280) (brackets in original).

■ Since both petitioners are black, there is, therefore, "no question . . . that . . . [they] are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws." *Rose v. Mitchell*, 443 U.S. at 563, 99 S.Ct. at 3005. Moreover, the method of selecting grand jury foremen in Madison Parish is certainly a "procedure that is susceptible of abuse." Although the grand jury venire is selected in a racially neutral manner, grand jury foremen are chosen from that list by Judge Adams according to his subjective criteria. Therefore, we are left with the question of whether the evidence offered by petitioners was sufficient to prove a significant underrepresentation necessary to establish a prima facie case. In answer to this question, we conclude that petitioners have failed to carry their burden of proving a sufficient underrepresentation of blacks as grand jury foremen, which is required to satisfy the "rule of exclusion" and create a prima facie case.

In their attempt to establish a prima facie case of discrimination, petitioners introduced evidence that the population of Madison Parish is approximately 60% black. In the hearings on petitioners pretrial motions, several witnesses testified that within their memory no black had ever served as a grand jury foreman in Madison Parish. In addition, the district attorney stipulated that to his knowledge no black foreman had ever been appointed by the two judges who were currently sitting in Madison Parish.[7] This was the only proof petitioners presented in support of their case. Here, as in *Rose v. Mitchell*, there was no evidence

presented as to the total number of grand jury foremen appointed by Judge Adams since he took office in 1963.

In *Rose v. Mitchell*, the Court held, as a matter of law, that two criminal defendants convicted in Tennessee had failed to make out a prima facie case of discrimination with respect to selection of grand jury foremen. One reason cited by the Court for its decision–the one which was most important to it–was that the record contained no evidence as to the total number of grand jury foremen appointed by the judges in the county where the defendants were indicted during the critical period of time.[8] The Court wrote:

"Most important, there was no evidence as to the total number of foremen appointed by the judges in Tipton County during the critical period of time. *Absent such evidence, it is difficult to say that the number of Negroes appointed foreman, even if zero, is statistically so significant as to make out a case of discrimination under the 'rule of exclusion.'* The only testimony in the record concerning Negro population of the county was to the effect that it was approximately 30% . . . . Given the fact that any foreman was not limited in the number of two–year terms he could serve, and given the inclination on the part of the judge to reappoint, it is likely that during the period in question only a few persons in actual number served as foremen of the grand jury. If the number was small enough, the disparity between the ratio of Negroes chosen to be foremen to the total number of foremen, and the ratio of Negroes to the total population of the county, might not be 'sufficiently large [that] it is unlikely that [this disparity] is due solely to chance or accident.' . . .

**7.** This stipulation established that at least for the last seventeen years, after Judge Adams assumed the bench in 1963, no judge in the parish had ever appointed a black as grand jury foreman.

**8.** The other reason cited by the Court was the fact that there was a lack of conclusive evidence in the record that for long periods of time no black had ever served as grand jury

foreman. The Court noted the only evidence to establish a prima facie case was "testimony from two former foremen and from a briefly serving present foreman that they had no knowledge of Negroes having served. There [was] no evidence that these foremen were knowledgeable about years other than the ones in which they themselves served." *Rose v. Mitchell*, 443 U.S. at 573, 99 S.Ct. at 3009.

Inasmuch as there is no evidence in the record of the number of foremen appointed, it is not possible to perform the calculations and comparisons needed to permit a court to conclude that a statistical case of discrimination had been made out, . . . and proof under the 'rule of exclusion' fails."

443 U.S. at 571, 99 S.Ct. at 3008 (footnotes and citations omitted) (brackets in original) (emphasis added).

Absent evidence as to the total number of foremen appointed by Judge Adams during his seventeen years on the bench, it is difficult for us to say that the fact that no blacks have been appointed to be foreman of the grand jury "is statistically so significant as to make out a case of discrimination under the 'rule of exclusion.' " *Id.*

Petitioners attempt to circumvent their lack of proof on this point by distinguishing between the characteristics of the selection system under scrutiny in *Rose v. Mitchell* and the procedure prescribed by Louisiana law for appointing grand jury foremen. They note that in Tennessee the foreman of a grand jury is appointed for a two year term. *See Rose v. Mitchell*, 443 U.S. at 548 n.2, 99 S.Ct. at 2996 n.2. They also observe that the state judge in *Rose v. Mitchell*, was inclined to reappoint the same people as foremen. These facts, they assert, are in sharp contrast to the Louisiana scheme.

In Louisiana, a grand jury must be impaneled twice a year in each parish. La. Code Crim.Pro.Ann. art. 414 (West 1967). Therefore, petitioners argue that two grand jury foremen must be chosen each year in Madison Parish. Moreover, in Louisiana a foreman's term is not subject to indefinite renewal since he is chosen out of a newly constituted grand jury venire from which previous foremen are excluded. La. Code Crim.Pro.Ann. arts. 410, 411, 413 (West 1967 & Supp.1980); La.Sup.Ct.R. 25, § 4. Petitioners insist that by operation of law, "new" foremen were chosen in Madison Parish semiannually from 1964 through

1979. Therefore, they maintain that it is not "likely" that only a few persons in actual number served as grand jury foremen during the relevant time. Finally, they conclude that the "rule of exclusion" is satisfied in their cases because there have been at least thirty–one separate grand jury foremen selected since (and not including) 1963,[9] none of whom were black, and that this is a large enough number of separate appointments to make the exclusion of blacks statistically significant.

Were there evidence that indeed thirty–one separate foremen had been selected, all of whom were white, we would certainly agree with petitioners that the "rule of exclusion" had been satisfied. However, the record before us contains no such evidence, and we are reluctant under the guise of judicial notice to supply the statistics necessary for petitioners to prove their case because of the legal and factual uncertainties inherent in the task. For example, although Louisiana law requires a grand jury to be impaneled twice a year, La. Code Crim.Pro.Ann. art. 414, it also provides that a "grand jury shall remain in office until a succeeding grand jury is impaneled" and that a "court shall not discharge a grand jury or any of its members before the time for the impaneling of a new grand jury . . . ." *Id.* The Louisiana Supreme Court has held that although judges should unquestionably comply with the law, a failure to impanel a grand jury twice a year in a particular instance, which works no injury to a defendant (indicted by a holdover grand jury) will not be grounds for overturning a conviction. *State v. Joseph*, 143 La. 428, 78 So. 663, 666 (1918). Therefore, under Louisiana law it is apparently quite possible to have a grand jury and its foreman hold over for an indefinite period of time.

Moreover, it is also difficult to accept the correctness of petitioners' postulate that through judicial notice of the state's law regarding jury selection, this court can as-

---

**9.** Petitioners obtain the figure of 31 foremen by multiplying two appointments per year for fifteen years (1964 through 1978, inclusive) and then add the 1979 appointment of the foreman of the grand jury that indicted them.

sume that thirty–one different people served as grand jury foremen during the relevant period of time. Aside from any holdover grand juries, and even assuming the law regarding removal of the names of persons who had previously served as jurors was faithfully complied with,[10] there exists the possibility that certain individuals served in the capacity of foreman on more than one grand jury during the relevant period of time. The possibility of such an occurrence is brought home by the fact that the foreman of the grand jury which indicted petitioners testified that in the last twenty years he had served on the grand jury in Madison Parish at least three times and had been the foreman at least once before.[11] Assuming that the jury commission faithfully deleted the names of persons with prior jury service in accordance with Louisiana's law as construed by this court, and assuming that there were no holdover grand juries during the relevant period of time, it is statistically possible–although not probable–that as few as five persons served as foreman of the Madison Parish grand jury since Judge Adams took office in 1963.[12] Although it is unlikely that only

10. This assumption may not even be valid due to the complexity of and the numerous changes in the laws on the exemption of persons with previous jury service and the deletion of their names from the general venire during the relevant period of time. The assumption is also somewhat strained due to the Louisiana Supreme Court's implicit recognition that the names of persons who have served as jurors within the past two years will through one means or another be included in the general venire, from which the grand jury venire is drawn. See La.Sup.Ct.R. 25, § 4 (providing that "if the name of such a person is included in a general venire, that person may claim an exemption from jury service or waive the exemption").

11. Louisiana has provided for the deletion of the names of persons with previous jury service since 1928. 1928 La. Code Crim.Pro. art. 188.

12. La. Code Crim.Pro.Ann. art. 410 (West Supp.1980) provides that at each meeting to revise and supplement the general venire, which must occur every six months, La. Code Crim.Pro.Ann. art. 408 C (West Supp.1980), the jury commission shall delete the names of those persons who have served as jurors since the previous selection of general venire six months earlier. See State v. Gros, 204 La. 705, 16 So.2d 238, 240 (1943) (noting that art. 188 of the Code of Criminal Procedure, from which the provision in art. 410 was derived, "requires that the names of all persons serving on previous juries be withdrawn from the box [containing the general venire] at the end of the six-month period"). This has been the law during the relevant period of time. Id. Therefore, if two grand juries were impaneled twice a year at six month intervals and if the name of the then sitting grand jury foreman was deleted from the general venire each time the jury commission met to revise and supplement the general venire (every six months), then that foreman's name could again be included in the general venire the next time the commission met (six months after the foreman's name had been deleted). It would then be possible for the foreman's name to again be randomly drawn and placed in the grand jury venire. Once on the grand jury venire again, it would be highly likely that Judge Adams would reappoint that person as foreman on the basis of the subjective criteria the judge used. Under art. 410, it is thus statistically possible that the same two persons could succeed each other as grand jury foreman from 1963 to 1979. The figure of as few as five persons, who could have served as grand jury foremen from 1963 to 1979, is derived by assuming the possibility that there could be two foremen (foreman "A" and foreman "B") succeeding each other from 1963 through 1976; then beginning in 1977 two new foremen (foreman "C" and foreman "D") would be introduced into the hypothetical construct, and in 1978 another new foreman ("E") would be included. The provisions of La.Sup.Ct.R. 25, § 4 necessitate the inclusion of the three additional foremen in order to complete our analysis. That section, which became effective on January 1, 1977, specifies that the "jury commission shall not include in, and shall delete from, the general venire the names of persons who have served as grand or petit jurors in criminal cases ... during a period of time two years immediately preceding their selection for jury service." Therefore, under our paradigm, it would be possible for as few as five persons to serve as grand jury foremen during the years in question: e. g., foremen "C" and "D" would serve during 1977; foreman "E" would serve during the first six months of 1978, and foreman "A" would serve during the second six months of 1978; foreman "B" would serve during the first six months of 1979, and foreman "C" would serve during the second six months of 1979.

Moreover, there may be some doubt whether a jury commission in Louisiana sitting from 1977 to the present would legally be compelled to follow the mandate of La.Sup.Ct.R. 25, § 4, as opposed to the legislatively enacted require-

five people served as grand jury foremen during these years, the possibility nonetheless exists that many fewer than thirty–one persons were appointed as foremen by Judge Adams during the critical period of time.[13]

Although we do take judicial notice of Louisiana law, we cannot presume by operation of that law the existence of statistics sufficient and significant enough to establish a prima facie case of discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment with respect to the selection of grand jury foremen. There are just too many variables and uncertainties in the application and operation of Louisiana's laws governing the selection of grand jury foremen for us to undertake such an endeavor. When it is easily within the power of a party upon whom the burden rests to prove facts essential to establish a prima facie case,[14] this court will not relieve that party of his burden of proof under the pretense of judicial notice.

### III.

■ Petitioners next challenge the validity of their state convictions on the ground that they proved a prima facie case that the grand jury which indicted them was selected by a jury commission from which blacks were systematically excluded. We disagree, holding that, here too, petitioners have failed in their efforts to prove a prima facie case.

No court appears to have dealt directly with the issue of whether a criminal defendant has a right, enforceable by the vacating of his conviction, to be indicted by a grand jury drawn from a venire constituted by jury commissioners who have been selected without regard to race. *But see Burks v. State*, 583 S.W.2d 389, 395 (Tex.Cr. App.1979) (noting issue). However, in *Carter v. Jury Commission of Greene County*, 396 U.S. 320, 338, 90 S.Ct. 518, 528, 24 L.Ed.2d 549 (1970), wherein a class of black plaintiffs by means of a civil suit alleged racial discrimination in the selection of jury commissioners, the Court assumed that a "State may no more exclude Negroes from service on the jury commission because of their race than from juries themselves." While we agree that it would be a denial of equal protection for a state to exclude blacks from a jury commission on account of their race, we doubt the validity of recognizing the right of a convicted defendant to obtain federal habeas corpus relief because he was indicted by a grand jury drawn from a venire constituted by jury

---

13. Also it should be noted that it is possible that more than thirty–one persons were appointed as grand jury foremen during the critical period of time. *See, e. g.*, La. Code Crim. Pro.Ann. art. 415(3) (West 1967) (providing for the appointment of a new foreman or an acting foreman if a foreman becomes unable to act for any reason); La. Code Crim.Pro.Ann. art. 415.1 (West Supp.1980) (providing for the impaneling of additional grand juries upon the request of the district attorney).

14. It would have been relatively easy for petitioners to show the total number of grand jury foremen who served during the critical years by introducing public records into evidence. Moreover, petitioners could have inquired of Judge Adams, while he was a witness, the total number of foremen he appointed during the critical period of time. Petitioners had advance knowledge, at least constructively, of the requirements of *Rose v. Mitchell* since that case was handed down three weeks before the hearing on their motion to quash the grand jury indictments.

---

ment of La. Code Crim.Pro. art. 410. The terms of La.Const. art. 5, § 5(A) only authorize the Louisiana Supreme Court to promulgate "procedural and administrative rules *not in conflict with law* ...." (Emphasis added.) Petitioners assert in their brief, and in a supplemental letter brief, that from 1963 to 1975 the jury commission was required to remove from the general venire the names of persons who had previously served as jurors for periods ranging from six months to three years. For example, from 1968 through 1974 a three year exemption was in effect, 1968 La. Acts, No. 108, § 1, *codified as* La. Code Crim.Pro. art. 403(5) (repealed), and during 1967 and 1968 a one year exemption was in effect, La. Code Crim.Pro.Ann. art. 403(5) (West 1967) (amended and repealed). We note that these time limitations were merely exemptions, personal to the individuals who had previously served on juries, and not binding on the jury commission in selecting the general venire. *See* La. Code Crim.Pro.Ann. art. 403 (West 1967) (amended and repealed).

commissioners who have been discriminatorily selected, at least absent a showing of prejudice to him, *i. e.* by allegations and proof of "biases inherent in a commission composed entirely of white people, without regard to claimed discriminatory selection by the [appointing authority]."[15] *Carter v. Jury Commission*, 396 U.S. at 338, 90 S.Ct. at 528. Nevertheless, it is not necessary that we decide the issue since we hold that, even assuming petitioners possess such a right, they have not proven a prima facie case of discrimination.

Petitioners attempted to establish a prima facie case of discrimination in the selection of jury commissioners by use of the "rule of exclusion" as discussed in *Hernandez v. Texas*, 347 U.S. 475, 480, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) and *Castaneda v. Partida.* However, in cases involving the selection of jury commissioners, use of the "rule of exclusion" to create a presumption of discriminatory purpose[16] has been implicitly rejected by the Supreme Court in *Carter v. Jury Commission.* There the plaintiffs had shown that black people comprised 75% of the county's population, 396 U.S. at 327, 90 S.Ct. at 522; yet no black had, at least in the last twelve years, been appointed as a jury commissioner in that county, 396 U.S. at 338, 90 S.Ct. at 528. In *Carter*, the district court found the plaintiffs "had shown only that for many years the jury commission had been composed entirely of white men, and concluded that without more [their] attack failed for want of proof." *Id.* In upholding the district

court's ruling, the Supreme Court noted that it could not "say on this record that the absence of Negroes from the Greene County jury commission amounted to a prima facie showing of discriminatory exclusion." *Id.*

We surmise that the motive behind the Court's implicit rejection of the "rule of exclusion" as an instrument to prove a prima facie case with regard to the selection of jury commissioners is the same primary reason denoted by the Court for its decision in *Rose v. Mitchell* that the applicants for habeas corpus therein had failed to make out a prima facie case of discrimination in the selection of grand jury foremen. The reason is that it is likely, during any relevant period of time in any given locality, that only a few persons in actual number serve as jury commissioners. If this number is small enough, the disparity between the ratio of blacks chosen as jury commissioners to the total number of persons who had served as jury commissioners, and the ratio of blacks to the total population in a specific county or parish, "might not be 'sufficiently large [that] it is unlikely that [this disparity] is due solely to chance or accident.'" *Rose v. Mitchell*, 443 U.S. at 571, 99 S.Ct. at 3008 (brackets in original).

The record before us reflects that from 1967 to 1979[17] ten persons served as appointed jury commissioners in Madison Parish. Four of these commissioners have been black and six have been white. Judge Adams testified that the membership of the commission only changed through attri-

---

**15.** Jury Commissioners neither return indictments as do grand juries, nor do they affect the possible return of an indictment as does the grand jury foreman. A criminal defendant is harmed only if the jury commission discriminatorily assembles the pool from which the venire is drawn to exclude members of his race.

**16.** A violation of the Equal Protection Clause is established by a substantial underrepresentation of race only if it results from purposeful discrimination. *See Castaneda v. Partida*, 430 U.S. at 493, 97 S.Ct. at 1279. Purposeful discrimination is inferred when the "rule of exclusion" is satisfied:

"The idea behind the rule of exclusion is not at all complex. If a disparity is sufficiently large, then it is unlikely that it is due solely to chance or accident, and, in the absence of evidence to the contrary, one must conclude that racial or other class–related factors entered into the selection process." *Id.* at 494 n.13, 97 S.Ct. at 1280 n.13.

**17.** We establish these years as the critical period of time because prior to 1967 the jury commission in Madison Parish consisted of five appointed members plus the elected clerk of court. After 1967, it consisted of four appointed members in addition to the clerk of court. *See* La. Code Crim.Pro.Ann. art. 404.

tion.[18] Because of this, there have only been six vacancies on the commission since 1967, three of which were filled by blacks. In view of these facts, we cannot say that a 20% disparity between the ratio of black jury commissioners to the total number of persons who served as jury commissioners and the percentage of blacks in the population of Madison Parish[19] is sufficiently statistically significant to create a prima facie case of purposeful discrimination.

Finally, although the record before us contains the testimony of the appointing official, unlike the record in *Carter v. Jury Commission*, 396 U.S. at 338, 90 S.Ct. at 528, we find nothing in Judge Adams' testimony that evidences a discriminatory purpose in the selection of jury commissioners. The judge was not questioned about the criteria he used in the appointment of jury commissioners. Nor was he questioned about the appointment of individual whites to the commission, that is, whether there were equally or better qualified blacks known to him and whether he appointed whites in preference to those blacks. If anything, Judge Adams' testimony reflects his desire to include all identifiable groups on the jury commission when vacancies occurred through attrition.[20]

Based on the foregoing reasons the judgment of the district court is AFFIRMED.

---

18. In fact, one member has served on the jury commission since 1963 when he was appointed by Judge Adams.

19. Out of a total of ten persons who have served as jury commissioners since 1967, four have been black. Thus 40% of the total number of appointed jury commissioners have been black. When this figure is subtracted from the percentage of the black population in Madison Parish, a disparity of 20% is reached. Chief Justice Burger has noted the inadequacy of this method of statistical analysis; the percentage of blacks eligible for service as jury commissioners–those eligible to serve as jurors, La. Code Crim.Pro.Ann. art. 404 A(1) (West Supp. 1980)–should be compared to the percentage of blacks who have served on the jury commission. *See Castaneda*, 430 U.S. at 504, 97 S.Ct. at 1285 (Burger, C. J., dissenting). In *Castaneda*, the Court proceeded on the basis of general population statistics because (1) it was not until oral argument before the Supreme Court that the State of Texas suggested that more narrow eligible population statistics would explain the disparity found by the Court, 430 U.S. at 488 n.8, 97 S.Ct. at 1276 n.8, and (2) there were "so many implicit assumptions" in the use of untested eligible population statistics which an appellate tribunal could not make

"without a record below in which those assumptions were tested." *Id.* It is significant that in other cases where appropriate statistics have been developed in the record, the Court relied on statistics reflecting the percentage of blacks presumptively eligible for jury service. *Alexander v. Louisiana*, 405 U.S. 625, 629, 92 S.Ct. 1221, 1224, 31 L.Ed.2d 536 (1972); *Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct. 4, 5, 19 L.Ed.2d 25 (1967); *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967); *Swain v. Alabama*, 380 U.S. 202, 205, 85 S.Ct. 824, 827, 13 L.Ed.2d 759 (1965).

20. In addition to appointing the first black to the Madison Parish jury commission, he appointed the first woman jury commissioner when a vacancy occurred after the law was changed eliminating the exemption of women from jury service unless they had previously filed a written declaration of their desire to serve on a jury. *See* La. Code Crim.Pro.Ann. art. 402. (West 1967) (superceded by La.Sup. Ct.R. 25); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (holding Louisiana constitutional and statutory provisions exempting women from jury service unconstitutional).