Billy GUICE and Howard Claxton, Sr., Petitioners-Appellants,

v.

Ray FORTENBERRY, Superintendent, East Carroll Parish Prison Farm, Respondent-Appellee.

No. 80–3350.

United States Court of Appeals, Fifth Circuit.*

Nov. 18, 1981.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

George M. Strickler, Jr., Ann Woolhandler, Michael G. Collins, New Orleans, La., Samuel Thomas, Tallulah, La., for petitioners-appellants.

James Caldwell, Dist. Atty., Tallulah, La., for respondent-appellee.

Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK and WILLIAMS,** Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Two black persons convicted of a crime in state court contend that they are entitled to a new trial because, as the result of a practice in effect for many years, blacks were systematically excluded from service as grand jury foremen both on the grand jury that indicted them and on prior grand juries. Appealing the district judge's denial of their petition for habeas corpus, which was based on his review only of the state court record, they seek an evidentiary hear-

---

** Judge James C. Hill was recused and did not participate in the consideration or disposition of this case. Judge William L. Garwood did not participate in this decision.

ing in federal court. Finding that the state court proceeding did not afford petitioners a full and fair hearing, we remand for an evidentiary hearing.

## I.

Petitioners were the police chief and assistant police chief of Tallulah, Louisiana, a community located in Madison Parish in the northeastern part of the state. In June 1979, they were indicted by a Madison Parish grand jury for the theft of $5,000, allegedly taken for their own use from a larger sum recovered by police shortly after the robbery of a grocery store.[1]

Petitioners were convicted by a unanimous six-member petit jury. A number of issues were raised before the district court, including allegations of racial discrimination in selecting the jury commissioners, the grand jury venire, the petit jury venire, and the grand jury foreman. Citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the petitioners also challenged the sufficiency of the evidence of guilt adduced in the state trial. In a written opinion, the district judge denied each of these claims. Although the petitioners' notice of appeal was comprehensive and a certificate of probable cause was granted on all issues decided by the district court, only the contentions of racial discrimination in selecting the grand jury foreman and the jury commission were briefed on appeal. Therefore, the district court's ruling on the

other claims is final. *See, e. g., Mayberry v. Davis*, 608 F.2d 1070, 1072 (5th Cir. 1979); *Pate v. Wainwright*, 607 F.2d 669, 670 (5th Cir. 1979); *Galtieri v. Wainwright*, 582 F.2d 348, 352 n.8 (5th Cir. 1978) (en banc).

A panel of this Court affirmed the denial of relief. 633 F.2d 699 (5th Cir. 1980). The Court en banc voted to rehear the case, 642 F.2d 98 (5th Cir. 1981) (en banc), thus vacating the panel opinion. *See* Fifth Circuit Local Rule 17. The petition for rehearing en banc raises only the contention that each petitioner's right to equal protection of the laws, guaranteed by the fourteenth amendment, was violated by the systematic exclusion of black persons from service as grand jury foremen.

## II.

The Supreme Court, in *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), held that racial discrimination in the selection of the grand jury and its foreman violates the fourteenth amendment and requires a federal court to grant habeas corpus, reversing a state criminal conviction. "[W]here sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, this Court uniformly has required that the conviction be set aside and the indictment by the unconstitutionally constituted grand jury be quashed." *Id.* at 553, 99 S.Ct. at 2998, 61 L.Ed.2d at 747.[2]

---

1. The facts giving rise to the criminal charge are fully reported in the panel opinion. 633 F.2d 699, 701 n.1 (5th Cir. 1980).

2. In *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979), Justices Brennan, Marshall, White and Stevens agreed with the view expressed in Part II of Justice Blackmun's opinion for a majority of the Court, from which the quotations summarizing the holding are taken. Justice Blackmun, joined only by Justices Marshall and Brennan, while adopting the principle that claims of grand jury discrimination should be considered by a federal habeas court regardless of resulting prejudice, was of the opinion that the petitioners had not satisfied their burden of proving discrimination. Justice White, joined by Justice Stevens, stated, "[A]lthough I agree with Parts I and II of the Court's opinion, I believe that a prima facie

case of purposeful discrimination was made out and was not rebutted by the State." They dissented from the other portions of the opinion. A majority of five members of the Court, therefore, held that federal habeas is available to petitioners who claim discrimination in the selection of a grand jury, and assumed it was available to redress claims of discriminatory selection of grand jury foremen. *See* The Supreme Court, 1978 Term, 93 Harv.L.Rev. 60, 199–209 (1979); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System 392–93 (2d ed. Supp. 1981).

Chief Justice Burger and Justices Stewart, Powell and Rehnquist did not join in Part II. 443 U.S. at 545, 99 S.Ct. at 2995, 61 L.Ed.2d at 743. Justices Stewart, Powell and Rehnquist, in concurring opinions authored by Justices Stewart and Powell, expressed the view that

The Court assumed, without deciding, that invidious discrimination in "the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." *Id.* at 553 n.4, 99 S.Ct. at 2998 n.4, 61 L.Ed.2d at 747 n.4. *See United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1120 (5th Cir. 1981) (en banc); *Williams v. Mississippi*, 608 F.2d 1021, 1022 (5th Cir. 1979). The Court recognized that a defendant who had already been convicted "suffered no possible prejudice," because the grand jury assays only probable cause, and, on the ultimate issue of guilt or innocence, the trier of fact had already determined that the defendant was guilty beyond reasonable doubt. 443 U.S. at 553, 99 S.Ct. at 2998, 61 L.Ed.2d at 747. Nevertheless, "[b]ecause discrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system and our society as a whole . . . a criminal defendant's right to equal protection of the law has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Id.* at 556, 99 S.Ct. at 3000, 61 L.Ed.2d at 749. Therefore, his conviction must be reversed without regard to prejudice. *Id.*

Recognizing the social costs associated with this approach, however, the Court noted that the defendant could again be indicted and tried. "[S]uch costs as do exist are outweighed by the strong policy the Court consistently has recognized of combatting racial discrimination in the administration of justice." 443 U.S. at 558, 99 S.Ct. at 3001, 61 L.Ed.2d at 751.[3] If convictions must be set aside because of taint of the grand jury, we see no reason to differentiate the result because discrimination affected only the foreman. Accepting the assumption made in *Rose v. Mitchell*, we hold, therefore, that the district court properly considered the claim of discrimination in the selection of grand jury foremen made in the habeas corpus petition filed by Guice and Claxton.

### III.

A constitutional basis for relief from discrimination is not proved merely by suspicion or loud outcry. The prerequisites for federal relief from the allegedly discriminatory selection of a grand jury were established in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The petitioner must: (1) establish that the group against whom discrimination is asserted is a recognizable, distinct class, singled out for different treatment; (2) prove the degree of underrepresentation by comparing the proportion of the group in the total population to the proportion called to serve, here as foremen, over a significant period of time; and (3) support the presumption thus created by showing that the selection procedure is susceptible to abuse or is not racially neutral. *Id.* at 494, 97 S.Ct. at 1280, 51 L.Ed.2d at 510, *cited with approval, Rose v. Mitchell*, 443 U.S. at 563, 99 S.Ct. at 3005, 61 L.Ed.2d at 754. *See United States ex rel. Barksdale v. Black-*

federal habeas relief should not be available to redress claims, such as grand jury discrimination, that do not touch on the fairness of a petitioner's conviction. *See also Cassell v. Texas*, 339 U.S. 282, 298–305, 70 S.Ct. 629, 637–40, 94 L.Ed. 839, 853–856 (1950) (Jackson, J., dissenting). Chief Justice Burger joined neither of these concurrences.

3. The Court added:
And regardless of the fact that alternative remedies remain to vindicate the rights of those members of the class denied the chance to serve on grand juries, the fact is that permitting challenges to unconstitutional state action by defendants has been, and is, the main avenue by which Fourteenth Amendment rights are vindicated in this context. Prosecutions under 18 U.S.C. § 243 have been rare, and they are not under the control of the class members and the courts. Civil actions, expensive to maintain and lengthy, have not often been used. And even assuming that some type of pretrial procedure would be open to a defendant, *e. g.*, petitioning for a writ of habeas corpus in federal court, under such a procedure the vindication of federal constitutional rights would turn on a race to obtain a writ before the State could commence the trial.
443 U.S. at 558, 99 S.Ct. at 3001, 61 L.Ed.2d at 751.

*burn*, 639 F.2d 1115, 1121–1123 (5th Cir. 1981) (en banc). Once these prerequisites have been proved, a prima facie case has been established and the burden shifts to the state to rebut that showing.

## IV.

■ If the facts necessary to support such a constitutional challenge are disputed, an evidentiary hearing is essential to the resolution of the claim. If no such hearing has been held in the state court, despite the exhaustion of state remedies, then a federal evidentiary hearing is obviously essential. If, however, the petitioner has been accorded a fair and complete opportunity to adduce evidence in state court, neither the petitioner nor the state should be put to the wasteful exercise of repetition in federal court.

■ While "the power of inquiry on federal habeas corpus is plenary," *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770, 785 (1963), it should not be employed merely to demonstrate its existence. However, "[w]here the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court.... In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Id.* at 312–313, 83 S.Ct. at 757, 9 L.Ed.2d at 785.

Expressly avoiding over-particularization, the Court set forth a catalog of six situations in which a federal hearing must be held. First, a federal hearing is required if "the merits of the factual dispute were not resolved in the state hearing...." *Id.* at 313, 83 S.Ct. at 757, 9 L.Ed.2d at 786. The

Court explained illustratively that a hearing was also required if "the material facts were not adequately developed at the state court hearing...." *Id.* Elaborating further on the necessity for adequate development of the relevant facts, the Court said a federal hearing was mandatory "[i]f, for any reason not attributable to the inexcusable neglect of petitioner, evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing...." *Id.* at 317, 83 S.Ct. at 759, 9 L.Ed.2d at 788 (citation omitted).[4]

Townsend was held to be entitled to a federal hearing on the voluntariness of his confession even though he had been accorded a state court hearing at his original trial. "The state trial judge rendered neither an opinion, conclusions of law, nor findings of fact.... [T]here are no indicia which would indicate whether the trial judge applied the proper standard of federal law in ruling upon the admissibility of the confession." *Id.* at 320, 83 S.Ct. at 761, 9 L.Ed.2d at 790. While the Court held that these defects in the state proceeding were significant enough by themselves to warrant an evidentiary hearing, it added, "[f]urthermore, a crucial fact was not disclosed." *Id.* at 321, 83 S.Ct. at 761, 9 L.Ed.2d at 790.

Following the decision in *Townsend*, the habeas corpus statute, 28 U.S.C. § 2254(d), was amended in 1966.[5] Courts have said uniformly that the amendment merely codified the *Townsend* criteria. *Brewer v. Williams*, 430 U.S. 387, 395–96, 97 S.Ct. 1232, 1238, 51 L.Ed.2d 424 (1977); *Harris v. Oliver*, 645 F.2d 327 (5th Cir. 1981); *Spinkellink v. Wainwright*, 578 F.2d 582, 590 (5th Cir. 1978), *cert. denied*, 441 U.S. 937, 99 S.Ct. 2064, 60 L.Ed.2d 667 (1979). *See also Maxwell v. Turner*, 411 F.2d 805 (10th Cir. 1969); *United States ex rel. Hughes v.*

---

**4.** The listing also included those instances in which (1) the state fact-finding procedures were "inadequate," (2) there is a substantial allegation of newly discovered evidence, (3) the state court determination of facts was not "fairly supported" by the record and (4) the state, for whatever reason, had not provided a full and fair hearing. *Townsend v. Sain*, 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770, 785 (1963). *See generally* Developments in the

Law: Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1113–1145 (1970); Wright & Sofaer, Federal Habeas Corpus For State Prisoners: The Allocation of Fact-Finding Responsibility, 75 Yale L.J. 895, 919–83 (1966).

**5.** Act of November 2, 1966, Pub.L. No. 89–711, § 2, 80 Stat. 1105, *amending* 28 U.S.C. § 2254(d).

*McMann*, 405 F.2d 773, 776 (2d Cir. 1966). *See generally* H.R.Rep. No. 1892, 89th Cong., 2d Sess. (1966); S.Rep. No. 1797, 89th Cong., 2d Sess. (1966), U.S.Code Cong. & Admin.News 1966, p. 3663. *Townsend* was not, however, completely superseded by the amendment, for the Supreme Court decided when a federal evidentiary hearing is mandatory while the habeas corpus statute, as amended, merely establishes a presumption that the state court judgment is correct unless the applicant establishes one of a number of specific reasons to disregard it.[6] *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). Because the district court did not rely on the statutory presumption, but decided that no evidentiary hearing was necessary, and then proceeded to determine the merits of the claim, we examine the state court record under *Townsend* precepts to determine whether a federal hearing was mandatory or whether the state court record provided an adequate basis for dispensing with the federal hearing.

## V.

After their indictment, the defendants filed a barrage of pretrial motions.[7] In addition to various claims of discrimination against black persons, their motion "to quash the jury commission, the general venire, the grand jury venire and the grand jury" charged that "blacks are excluded from serving on the grand jury and as

---

**6.** [T]he statute does not purport to define when a federal evidentiary hearing is mandatory; it appears merely to state a set of rather confused burden of proof rules to guide the district courts which are holding such hearings."

P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System 1505 (2d ed. 1973).
    The statute lists eight possible deficiencies in state court fact-findings (rather than the Townsend six); but their relevance is to the question whether the state findings are to be "presumed" correct. Further, if none of the eight deficiencies is shown, the effect of this is, not to negate the power of the judge to call for a hearing, but, confusingly, to shift to the petitioner the burden to show at a hearing that the state findings were erroneous. The statute also leaves it unclear whether, if one of the eight deficiencies is established, the burden of proof on all facts shifts to the state.
    Of the eight statutory criteria, three (lack of jurisdiction in state court; failure to appoint counsel when this was constitutionally required; applicant was denied due process in the state court proceedings) are not found in Townsend (but would not appear to change the law). The remaining five appear to subsume the Townsend six.
*Id.* at 1505 n.7. *See also* 17 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4265 (1978).

**7.** Excluding motions for continuances and certain other procedural motions, the pleadings record discloses that the following pretrial motions were filed:
Motion to Recuse the District Attorney;
Motion to Compel the Election by District Attorney (To Compel Him to Elect Which Indictment He Will Fix For Trial First);
Motion to Quash Arraignment and Trial Date;

Motion to Purge Jury Wheel and Enlarge Sources From Which Venire Was Selected;
Motion to Quash The Grand Jury Indictment on The Ground That The Manner of Selection of the General Venire, The Grand Jury Venire, The Grand Jury and the Grand Jury Foreman Was Illegal Because Black Citizens Were Excluded As the Official Policy of the Judges, Etc.;
Application for Bill of Particulars;
Supplemental Motion to Recuse the District Attorney;
Motion to Disclosure [*sic*] and Produce Evidence Affecting Cross-Examination, Credibility and Jury's Demeanor, Evaluation Of State Witness, and for Brady Material;
Motion to Suppress Any Inculpatory Statement;
Motion to Quash Act 527 of 1975 As It Amends CCP [CCrP] Article 778;
Motion To Quash the Grand Jury Indictment [This appears to be the same as the prior motion to Quash Grand Jury Indictment];
Motion for Preliminary Examination;
Motion to Enjoin Use by the State of Peremptory Challenges to Exclude Qualified Blacks From Petit Jury Service;
Motion to Quash the Petit Jury Venire Selected for the Week Beginning September 17, 1979;
Motion for Production of Janie Jones' Grand Jury First Appearance Testimony;
Motion to Recuse the Judges of the Sixth Judicial District;
Motion to Quash the Jury Commission, the General Venire, the Grand Jury Venire and the Grand Jury;
Motion to Quash Arraignment and Cancel Trial Date.

Foremen solely because of their race." The defendants also filed a motion to recuse the judges of the state court on the ground, in part, that those judges had purposely excluded black citizens, solely because of their race, from serving as jury foremen and from being included in the grand jury venires.[8] In addition, they filed a separate motion to quash the indictment contending, inter alia, that the manner of selection of the grand jury and the grand jury foreman was illegal because black citizens were excluded.

The first motion set for a hearing was the motion to recuse the judges of the state court. This was assigned, in accordance with the requirements of Louisiana law, La.Code Crim.Pro.Ann. art. 675 (West 1967), to a judge from another district. That specially designated judge presided at a hearing directed entirely at the defendants' effort to show that the judges of the district should be disqualified because of their alleged prejudice against black persons. *See id.* art. 671. Judge Adams, the senior of the two judges of that district, and the judge to whom the case was assigned, testified that he had never selected a black foreman in the fifteen or sixteen years from the time of his appointment until the empanelling of the grand jury that indicted the defendants. Several other witnesses testified regarding the jury selection process. The witnesses were also questioned about any biases or prejudices of the two judges. The junior judge of the district, though subpoenaed, was not called as a witness. Finding that there was no group against which either judge was so biased or prejudiced "that they would be unable to conduct a fair and impartial trial," the designated judge orally denied the motion.

A later hearing was held before the trial judge, Judge Adams, on the motion to quash the grand jury indictment. Evidence was introduced concerning the composition of the jury commission, and other matters, but there was no further evidence concerning, nor any mention of, the allegedly discriminatory selection of the grand jury foreman. The testimony adduced at the recusal hearing was, however, expressly incorporated by stipulation. At the conclusion of the hearing, without reference to the claim of discriminatory selection of the grand jury foremen, Judge Adams denied the motion.

Several other motions, including the motions to purge the jury wheel and to quash the grand jury, grand jury venire and the jury commission, were also considered on the same day and Judge Adams denied them all, saying only that "the Defense has failed greatly in fulfilling the burden."[9] The defense assigned error each time the trial judge denied a motion. Following disposition of all the motions, a jury trial was held and the six member petit jury returned a verdict against Guice and Claxton.[10] The defendants, alleging eight grounds for error, including discriminatory selection of the grand jury foreman,[11] applied to the Supreme Court of Louisiana for a writ of certiorari. The Supreme Court, without opinion, denied the writ.

Following application to the federal district court for a writ of habeas corpus, the judge found that the state court record enabled him to resolve the merits of the application on the basis of the record alone without an evidentiary hearing,[12] and de-

8. *See* La.Code Crim.Pro.Ann. art. 671 (West 1967).

9. The judge's rulings on all these motions were delivered orally. No findings of facts regarding the selection of foremen, or any other issue, are stated in the record or transcript.

10. The petit jury consisted of five women and one man, of whom two were black.

11. The application for a writ of certiorari alleged trial court error in denying the motions (1) to recuse the judges, (2) to recuse the dis-

trict attorney, (3) to quash the grand jury indictment, (4) to quash the jury commission, the general venire, the grand jury venire and the grand jury, (5) to purge the jury wheel and enlarge sources from which venires are selected, (6) to quash the petit jury venire, (7) to substitute a different petit jury venire, and (8) for a new trial.

12. No express motion was made for an independent evidentiary hearing. In a minute entry denying petitioners' request to stay the execution of their sentences, the district court stated

nied the application. In their appeal, the petitioners seek issuance of the writ or, in the alternative, they now expressly request remand for an evidentiary hearing.

## VI.

■■■ While the federal habeas court is required by *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), to conduct a hearing in certain circumstances, such a hearing is not required unless the petitioner alleges facts that, if proved, would entitle him to the writ. *Cronnon v. Alabama*, 587 F.2d 246 (5th Cir.), *cert. denied*, 440 U.S. 974, 99 S.Ct. 1542, 59 L.Ed.2d 792 (1978). The facts before the district court must be considered together with the mere charges in the complaint to determine the sufficiency of the charges to warrant relief. The state court record here clearly reveals that petitioners had satisfied the first and third elements of the prima facie

case outlined in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977): discrimination against a recognizable distinct class and a selection procedure susceptible to abuse. Thus, the question before us is the narrower one whether the charges in the habeas corpus petition, in the light of the state court record, set forth facts that, if proved, would demonstrate, over a significant period of time, sufficient underrepresentation of blacks in the selection of grand jury foremen to entitle petitioners to habeas relief.

At the hearing concerning the motion to recuse the state court judges, Judge Adams testified in effect, that he had never appointed a black as grand jury foreman.[13] In addition, a current member of the jury commission and a former police chief, who was a life-long resident of Madison Parish, both testified that, to their knowledge, a black had never been appointed foreman.[14]

---

that "the court will determine whether an evidentiary hearing is necessary."

**13.** The transcript of Judge Adams' testimony on the subject reads as follows:

Murphy Bell [defense counsel]:
Now, Judge, can you give us some idea what criteria you utilize to select a jury foreman after you impanel a Grand Jury?

Judge Adams:
Well, I have never lived anywhere else but Tallulah in all my life except for time spent in college and time spent in the army and uh . . . when I get the jury list . . . now you said for a Grand Jury foreman?

Murphy Bell:
Yes, sir.

Judge Adams:
When I get the Grand Jury venire I look for a person who can perform the duties to my knowledge of a foreman and that is he can preside over the . . . over the Grand Jury . . . he can administer the oath, he can read and write, he would be able to articulate what the proceedings were, and I'll be perfectly frank if uh . . . that uh . . . that if he didn't like what the District Attorney was doing would let it be known. And so uh . . . I look for good qualified, decent and I generally think of his morals, also. And uh . . . that's what I look for.

Murphy Bell:
Well, during the course of your years on the bench did you ever find any black person who had those qualities?

Judge Adams:

Yes, I've been tempted to try it. But I still in my humble opinion I pick the one that I thought was best qualified for the job and I believe that sincerely that the law gave me that right and that discretion and authority and I would have been remissed [sic] had I not used it. I don't have any scruples of feelings against appointing a black as a foreman and I'll say this, there will be blacks on there but as of this moment the ones that I have felt were the ones that were best suited were the ones that were appointed.

Murphy Bell:
Your Honor, I'm not questioning your authority, Judge.

Judge Adams:
I know exactly what you are doing and I want to be sure that I as long as the law gives me that discretion I will endeavor to use it to fulfill those requirements that I have announced and not to be badgered by an attorney who is seeking to make a problem out of something that a problem doesn't exist.

Murphy Bell:
Well, the fact of the matter I was trying to find out, we have alleged that you have never appointed a black citizen?

Judge Adams:
Now, I said that we will eventually get to that.

Murphy Bell:
Alright then, we will leave it at that, Judge.

**14.** *See Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (prima facie

While there was thus positive evidence that no black had ever been appointed foreman of a grand jury, only inferential evidence existed to show the number of grand jury foremen actually selected during the relevant period.

Louisiana law requires that a new grand jury be empanelled every six months. La. Code Crim.Pro.Ann. art. 414 (West 1967). Therefore, during Judge Adams' fifteen year tenure, thirty-one foremen would have been selected if article 414 had been followed.[15]

It is, of course, conceivable that fewer than thirty-one different individuals were appointed as foreman. Yet, when the provisions of Louisiana law pertaining to grand jury selection are considered, the probability that significantly fewer than thirty-one individuals served becomes slight.

In Louisiana, the general venire is composed of at least 300 persons selected by a parish jury commission. La.Code Crim. Proc.Ann. art. 408(A) (West Supp.1980).[16] The jury commission is required to meet at least once every six months. Id. art. 408(C). The commission is required by statute, at each meeting called to select or to supplement the general venire, to delete from the venire the names of all persons who have served as jurors since the last selection of the general venire.[17] Id. art. 410. See State v. Gros, 204 La. 705, 707, 16 So.2d 238, 240 (1943). In addition, a Louisiana Supreme Court rule, which became effective in 1977, requires deletion of the names of those persons who have served as grand or petit jurors during the two year period im-

mediately preceding the selection of the jury venire. La.Sup.Ct.R. 25, § 4.

When a court orders a grand jury to be empanelled, a grand jury venire consisting of the names of "at least 20 but not more than one hundred persons" is selected from the general jury venire. La.Code Crim. Proc.Ann. art. 411. In Madison Parish, the clerk draws a grand jury venire consisting of forty persons.

The grand jury in Louisiana consists of twelve persons selected or drawn from the grand jury venire. Id. art. 413. The court first selects one person from the grand jury venire to serve as foreman. Id. The eleven other members of the grand jury are then selected by random drawing from the remaining thirty-nine. Id.[18]

Thus, foremen, at least until 1977, were chosen out of a newly constituted grand jury venire from which jurors who had served during the prior term, including, of course, the previous foreman, were excluded. Id. arts. 410, 411, 413. After 1977, assuming adherence to the then newly promulgated Supreme Court rule, the grand jury venire excluded jurors who had served during the preceding two years. La.Sup. Ct.R. 25, § 4. Moreover, even if the name of a person who had served as foreman were by accident not deleted from the general venire after he had served, he could not be reappointed unless by chance his name was among the forty potential grand jurors drawn from the general venire of 600. If a person who had once served as a grand jury

---

case of discrimination in the selection of juries proved, in part, by the testimony of lifelong county residents and various court and jury commission officials.) Cf. Rose v. Mitchell, 443 U.S. 545, 571, 99 S.Ct. 2993, 3008, 61 L.Ed.2d 739, 759 (1979) ("[t]here thus was no positive testimony that no Negro had ever served during the critical point in time").

**15.** The total of thirty-one is computed by assuming two foremen were chosen in each year, including 1978, plus the appointment in 1979 of the foreman of the grand jury that indicted Guice and Claxton. See La.Code Crim.Pro. Ann. art. 414 (West 1967).

**16.** According to the testimony of the Madison Parish Clerk of Court, the general venire in Madison Parish consisted of at least 600 persons.

**17.** The statute is silent regarding the manner in which the persons placed in the general venire are selected. According to testimony adduced with respect to the motion to quash the grand jury indictment, the general venire is drawn by lot from the "big barrel" or jury wheel.

**18.** For a review of grand jury selection procedures and the powers of the grand jury, see Comment, Selected Problems of the Louisiana Grand Jury, 52 Tul.L.Rev. 707, 708–10 (1978).

foreman had been correctly excused for the requisite period, his name would not automatically be restored to the general venire, but would be included in that group of 600 only if drawn randomly from the jury wheel for inclusion in the reconstituted general venire. In either instance, once a person was included in the general venire, the probability against his name being included in the grand jury venire is fifteen to one.

It is, therefore, obviously possible, but highly unlikely to occur repeatedly, that the name of a person who served on a prior grand jury might later have been returned to the general venire, drawn at random for the grand jury venire, and then chosen by the judge.[19] However, whether thirty-one or some slightly smaller number of different persons served, the state judge had performed the duty of appointing a foreman thirty-one different times. Not a single black was ever chosen. The population of Madison Parish is approximately 60% black.[20] Even if the number of different foremen who actually served was less than thirty-one as a result of repeated selection of persons who had served previously, there was a significant underrepresentation of blacks. For example, if selection were made at random from a group composed of 60% black persons and 40% white persons, the probability of five successive selections of a white is approximately 100 to one and the probability of ten such successive selections is 10,000 to one.[21]

This formula is not, of course, directly applicable to the selection of a grand jury foreman. Even in a parish whose population was 60% black, the forty-name grand jury venire might not have mirrored the population. Moreover, foremen were not randomly selected, but were chosen based on qualifications. Even the credulous, however, would find it difficult to believe that, absent racially discriminatory motivation, no qualified black person could have been found and appointed in thirty-one selections, from a pool composed each time of forty names, a total over the seventeen and a half year period of 1240 persons, of whom a substantial number, likely half, were black.[22]

We have said in another context, "[s]tatistics are not, of course, the whole answer, but nothing is as emphatic as zero...." *United States v. Hinds County School Board*, 417 F.2d 852, 858 (5th Cir. 1969). In *Rose v. Mitchell*, the Supreme Court noted that the record did not disclose the total number of foremen selected during the relevant period. "Absent such evidence, it is difficult to say that the number of Negroes appointed foreman, even if zero, is statistically so significant as to make out a case of discrimination under the 'rule of exclusion.'" *Rose v. Mitchell*, 433 U.S. 545, 571, 99 S.Ct. 2993, 3008, 61 L.Ed.2d 739, 759

---

**19.** Unlike the testimony adduced in *Rose v. Mitchell*, 433 U.S. 545, 571, 99 S.Ct. 2993, 3008, 61 L.Ed.2d 739, 759 (1979), there was no suggestion by Judge Adams that he looked favorably upon past foreman experience. Considering that Louisiana law precluded holdover grand juries and the improbability of repeated selection in the grand jury venire, it is not surprising that experienced foremen did not appear often. Although one person testified at the state court hearing on the motion to recuse the judges that he had served "at least once previously" as foreman, this patently would not likely have occurred with any degree of frequency.

**20.** The 1970 census showed that the population was 15,065 persons of whom 9,385 were black, making the ratio about 62% black. The relative number of black residents has since declined. In *Wyche v. Madison Parish Police Jury*, 635 F.2d 1151, 1155 (5th Cir. 1981), the panel, based on later data, concluded that in 1979 Madison Parish's population was 58% black.

**21.** The probability is calculated in a scientifically recognized manner by the use of a formula or a table. *See* M. Hamburg, Statistical Analysis for Decision Making 690, Table A–1 (2d ed. 1977). The probability of five successive selections of a white person, from a population consisting of 60% blacks and 40% whites, is 1.000—0.9898 or .0102. A probability of .0102 means that the result can be expected statistically to occur 102 times if the event is repeated 10,000 times. The probability of ten such successive selections is 1.000–.9999 or .0001.

**22.** The petit jury venire from which the jury was drawn contained the names of twenty-seven blacks and thirty-three white persons.

(1979).[23] Because of the absence of positive proof of the actual number of foremen chosen, we do not now conclude that Guice and Claxton proved a prima facie case, but only that the record demonstrated the likelihood that they could prove facts entitling them to relief. We turn then to the question whether a remand for a federal evidentiary hearing is required by the record.

## VII.

Townsend requires a federal hearing when the merits of the factual dispute were not resolved by the state court. *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *See* Part IV, *supra*. *See also Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). While the petitioners introduced a substantial amount of testimony regarding the allegedly discriminatory selection procedures, the motions were not made, and the testimony was not developed, in a coherent fashion. The trial judge orally denied the motions challenging the propriety of the foreman selection proceedings [24] without making any findings of fact. This lack of express findings does not inexorably require a federal hearing, for the federal district court may "reconstruct" the findings of the state court if the state judge expressly or impliedly applied the

correct constitutional standard. The state judge here articulated no legal standard under which he evaluated petitioners' claim. Although we would ordinarily assume that the state judge applied the correct legal standard, *id.* 372 U.S. at 314–15, 83 S.Ct. at 758, 9 L.Ed.2d at 786–787, the confused nature of the presentation of the claims to the trial court militates against this assumption. This indicates the necessity of a federal hearing, but it does not stand alone.

The Supreme Court in *Townsend* also required a federal hearing "[i]f, for any reason not attributable to the inexcusable neglect of petitioner, ... evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing ...." *Id.* at 317, 83 S.Ct. at 759, 9 L.Ed.2d at 788 (citation omitted). It is plain that one determinative fact, the number of grand jury foremen actually chosen by Judge Adams, was not adduced during the state court proceedings. The only remaining question then is whether Guice and Claxton inexcusably neglected to present that piece of crucial evidence. The Court in *Townsend* defined inexcusable neglect by reference to the deliberate bypass standard articulated in *Fay v. Noia,* 372 U.S. 391, 438, 83 S.Ct. 822, 848, 9 L.Ed.2d 837, 868

---

**23.** The facts of *Rose v. Mitchell* were significantly different from those here presented. In *Rose v. Mitchell,* there was no positive evidence that blacks had been totally excluded from the position of foreman. The record disclosed that the black population of the county was approximately 30%. Moreover, the foremen served two year terms and were not limited in the number of terms they could serve. This showing was held insufficient to establish a prima facie case. The Court contrasted the proof introduced in *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935), as being sufficient to establish a prima facie case.

The petitioners in *Norris* presented uncontroverted testimony that, within the memories of several witnesses, no black had served on any jury. This testimony was corroborated by several court and municipal officers. While not mentioned in *Rose v. Mitchell,* the percentage of eligible blacks in *Norris* was less than 8%. Without specifying the number of jurors actually involved, the Court held that the foregoing "testimony in itself made out a prima facie case of the denial of equal protection which the Constitution guarantees." While it is, of

course, easier to assume a significant number of jurors than grand jury foremen, the evidence presented in *Norris* illustrates the weight of the proof adduced by Guice and Claxton.

For the purpose of determining whether a federal evidentiary hearing is here required, it is perhaps noteworthy that the mandate in *Rose v. Mitchell* directed that the case be remanded for "further proceedings consistent with this opinion." 443 U.S. at 572, 99 S.Ct. at 3009, 61 L.Ed.2d at 759. The Court did not specify, however, whether an evidentiary hearing was required. *See id.* at 592 n.5, 99 S.Ct. at 3019 n.5, 61 L.Ed.2d at 772 n.5 (White, J., dissenting); The Supreme Court, 1978 Term, 93 Harv. L.Rev. 60, 201 n.19 (1979).

**24.** Both the "Motion to Quash the Jury Commission, the General Venire, the Grand Jury Venire and the Grand Jury" and the "Motion to Quash the Grand Jury Indictment" raised the issue of discriminatory selection of grand jury foremen. The "Motion to Recuse" also raised this issue, but it was denied by the judge designated to hear only that motion.

(1963), and concluded that "if for some justifiable reason [the petitioner] was previously unable to assert his rights or was unaware of the significance of the relevant facts" a hearing should be held.[25] *Townsend v. Sain*, 372 U.S. at 317, 83 S.Ct. at 759, 9 L.Ed.2d at 788.

The neglect of Guice and Claxton to develop the crucial facts is not explained by the record. There is no substantial allegation that the petitioners made a tactical choice to leave the evidence undeveloped. It appears more likely that, based on the inartful and scattershot nature of the various motions, the defendants and their attorneys did not appreciate fully the relevance of the missing evidence. Such neglect is not inexcusable within the meaning of *Fay v. Noia*. The Court in *Townsend* noted that an expert witness "inexplicably" failed to develop the "crucially informative characterization" of the drug involved as a "truth serum." "Under the circumstances," the Court held, "disclosure of the identity of [the drug] as a 'truth serum' was indispensable to a fair, rounded development of the

material facts. And the experts' failure to testify fully cannot realistically be regarded as Townsend's inexcusable default." *Id.* 372 U.S. at 322, 83 S.Ct. at 761–62, 9 L.Ed.2d at 791.[26]

The failure to develop fully the material facts of the number of grand jury foremen actually chosen was similarly not the result of a deliberate bypass. The state court proceeding was plainly not a full and fair hearing, nor was it followed by any exposition of the facts found. In fact, the trial judge, when ruling on the crucial motions, did not even refer to the alleged constitutional violation now at issue. Moreover, the very judge whose actions were being challenged was put to the task of deciding whether he had discriminated racially in violation of his own constitutional duties. *Cf. id.* at 316, 83 S.Ct. at 759, 9 L.Ed.2d at 787 (if the fact-finding procedure, even though not violative of the Constitution, appears to have been seriously inadequate for the ascertainment of truth, the federal judge has a duty to take evidence).[27]

**25.** While the teachings of *Fay v. Noia* have been rejected in several contexts, *see, e. g., Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (habeas corpus unavailable to challenge *Miranda* violation when state courts refused to consider the claim because of noncompliance with a state contemporaneous-objection rule); *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (federal habeas court should not hear state prisoner challenges, resting on the fourth amendment when the state courts have afforded a full and fair opportunity to litigate those claims); *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976) (state prisoner who failed timely to challenge the racial composition of the grand jury that indicted him could not, after his conviction, bring that challenge in a federal habeas corpus proceeding), neither the Supreme Court nor this Court has ever suggested that the standard developed in *Francis* and adopted in *Sykes* should replace the deliberate bypass standard in the *Townsend* inquiry. *Cf. Gates v. Henderson*, 568 F.2d 830, 837–40 (2d Cir. 1977) (en banc) (court held that *Stone v. Powell* displaced the *Townsend* inquiry, if the state provides an opportunity to the petitioner to litigate his fourth amendment claim), *cert. denied*, 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978). Indeed, the policies relied upon in those cases, federalism, comity and concerns for the orderly administration of

criminal justice, do not apply when the prisoner has challenged the violations throughout the state process and the state has held proceedings directed at the constitutional claim reasserted in a federal habeas court.

**26.** *See also* Wright & Sofaer, Federal Habeas Corpus For State Prisoners: The Allocation of Fact-Finding Responsibility, 75 Yale L.J. 895, 971 n.273 (1966) ("Actually, this 'failure' to testify was no more than a failure by counsel to develop the relevant facts through his witnesses. The Court's refusal to regard this failure as an inexcusable default reflects its position that unintentional flaws of counsel should not bar the assertion or full development of federal rights.").

**27.** In *Rose v. Mitchell*, a federal evidentiary hearing had been held even though the state court had previously conducted such a hearing. While not directed at the need for a separate evidentiary hearing, but buttressing its reasons for federal relief by the Great Writ even after the claim had been heard in state court, the Supreme Court stated:

Federal habeas review is necessary to ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate that system.

\* \* \* \* \* \*

The need for an evidentiary hearing becomes even more evident when we consider the limited evidence presented in state court and evaluate it in the light of the provisions of state law set forth in Part VI above. These statutory provisions were never mentioned in the state record. That, from a venire selected in a racially nondiscriminatory manner in a parish where the population is approximately 60% black, there would be no racial discrimination in the selection of a white foreman thirty-one successive times is so unlikely as to demand at least exploration. There are stranger things on earth than judges ever dreamed of, but, when an event whose occurrence is statistically implausible occurs repeatedly, and persons whose constitutional rights might thereby be affected offer to prove that it would not have occurred absent constitutional violation, they should at least be afforded a day in federal court.

## VIII.

For the reasons stated above, we REVERSE the denial of the writ of habeas corpus and REMAND for an evidentiary hearing on the question of racial discrimination in selecting a grand jury foreman.

On application for rehearing en banc the petitioners suggest no fault with the panel's determination that the jury commission was not chosen improperly. Accordingly, we reinstate Part III of the panel opinion, 633 F.2d 699, 707–09 (5th Cir. 1980), and, for the reasons stated in that opinion, we affirm, in that respect, the district court's judgment.

REVERSED and REMANDED.

REAVLEY, Circuit Judge, with whom RONEY, GEE and FAY, Circuit Judges, join, dissenting:

Vigorous counsel for Guice and Claxton had an unimpeded opportunity when they were before the state court to make any available proof of racial discrimination in the selection of the grand jury foreman. They requested no further hearing in the federal district court. They made no complaint on that ground when they appealed to this court. After a panel held that their proof was lacking, on rehearing they then asked for an evidentiary hearing in which they could try again.

The en banc court, adopting a statistical model based on population figures that would establish a prima facie case of discrimination if no more than thirteen black grand jury foremen were chosen out of the last thirty-one, now grants their request— laboring to justify the grant by saying that counsel must have failed to make their proof in the state court because of "the confused nature of the presentation of the claims to the trial court." 661 F.2d at 506.

I would not mandate an evidentiary hearing in the federal court after one has already been held in the state court unless the petitioner asks for it. To my mind, the record before the district judge did not necessitate an additional hearing. I would affirm his judgment.

Moreover, the statistical analysis adopted by the majority is mistaken. They suggest that the petitioners can prove that blacks have been underrepresented in the selection of grand jury foremen in Madison Parish over a significant period of time, *see Rose v. Mitchell*, 433 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (quoting *Castenada v. Partida*, 430 U.S. 482, 495, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)),[1] by adopting as

---

As noted above, in this case, the very judge whose conduct respondents challenged decided the validity of that challenge.
443 U.S. at 563, 99 S.Ct. at 3004, 61 L.Ed.2d at 754.

1. Under *Castenada v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a claimant who alleges an equal protection violation because members of his race have been systemat-

ically excluded from grand jury service must prove three elements of a prima facie case. First, ... that the group [to which he belongs] is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied .... Next, the degree of underrepresentation must be proved .... Finally ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination ....

part of their proof an improper statistical model based on the cumulative binomial probability distribution. Under this model, the petitioners would need to put into evidence only the number of times a grand jury foreman was selected in Madison Parish and the racial composition, percent black or percent non-black, of the parish in order to demonstrate the probability that a specified outcome—in the instant case the successive selection of thirty-one non-black grand jury foremen—will occur.

Traditionally, in lawsuits alleging discrimination, if the probability of an outcome occurring is less than .05, one out of twenty, and no other explanation for the result is available, the courts have ruled out the possibility that the event was due to chance alone and have inferred that the outcome was due to impermissible discrimination in the selection process. *See* D. Baldus & J. Cole, Statistical Proof of Discrimination §§ 9.02, 9.03 (1980). The majority follow this approach and take for the pool from which grand jury foremen are chosen the population composed of 60% blacks and 40% non-blacks of Madison Parish, Louisiana. They calculate that the probability of ten successive selections of a non-black from this population is approximately 10,-000 to one. They then conclude that if Judge Adams had made thirty-one selections, "absent a racially discriminatory motivation [a] qualified black person could

have been found and appointed" grand jury foreman.[2] 661 F.2d at 505.

In reaching this conclusion, the majority necessarily make one of two assumptions. Either they assume that no legitimate reason exists to choose one venireman rather than another to serve as foreman and, as a result, the choice of a black or a non-black foreman should occur at random. Or they assume that on each of the past thirty-one grand jury venires the proportion of blacks who are as qualified to serve as foreman as the most qualified person on the venire, and are thus eligible for service as foreman, is constant and is the same as the proportion of blacks in Madison Parish. The majority, however, are justified in assuming neither. Louisiana has decided to select from the grand jury venire the most qualified person to serve as foreman. Thus, because the selection of a foreman is based on qualifications, there is no reason to presuppose that the selection of blacks and non-blacks to serve as foreman will occur at random. Moreover, there is no reason to assume that on each of the previous thirty-one venires the proportion of qualified blacks who are eligible for selection as grand jury foreman is constant and equals the proportion of blacks in the population of Madison Parish.

The distribution upon which the majority builds its statistical model, the cumulative binomial probability distribution, is, in turn, based on a Bernoulli process. A Bernoulli

---

*Id.* at 494, 97 S.Ct. at 1280. I, of course, agree with the majority that the petitioners have proved the first and third elements of their prima facie case. I said so in the prior panel opinion.

> Since both petitioners are black, there is, therefore, "no question ... that ... [they] are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws." Moreover, the method of selecting grand jury foremen in Madison Parish is certainly a "procedure that is susceptible of abuse."

*Guice v. Fortenberry*, 633 F.2d 699, 704 (5th Cir. 1981) (quoting *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979)) (citation omitted).

2. The issue in this appeal is not whether Judge Adams could have selected one or more qualified black persons to serve as grand jury foreman any one of the thirty-one times he appoint-

ed a new foreman. Rather, the issue in this appeal is whether the petitioners have made out a prima facie case of an equal protection violation by showing that the procedures used to select grand jury foremen have resulted in a substantial underrepresentation of their race. *Rose v. Mitchell*, 433 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (quoting *Castenada v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)). Whether persons of one race or another "could" have been selected for service as grand jury foremen plays no part in this determination. Indeed, the majority recognize as much at the outset of their opinion when they focus on whether "blacks were systematically excluded from service as grand jury foremen both on the grand jury that indicted [the petitioners] and on prior grand juries." 661 F.2d at 497.

process has four characteristics. First, an event can have only two possible outcomes. Second, the probability of both outcomes is constant. Third, the occurrence of a particular outcome in one trial cannot affect the outcome in a subsequent trial. And, fourth, successive outcomes occur without any fixed pattern. *See* C. Clark & L. Schkade, Statistical Analysis for Administrative Decisions 89 (3d ed. 1979).

Continuous tosses of a coin is the classical example of a Bernoulli process. A flip of a coin answers in either heads or tails. The chance of either a head or a tail on any toss is constant. No result on a prior toss affects a subsequent toss.[3] Outcomes of heads or tails occur at random.

The cumulative binomial probability distribution is defined by two parameters. One parameter is a proportion, usually represented by the letter $p$, that indicates the probability of either one of the two possible outcomes of a Bernoulli trial. The other parameter, usually represented by the letter $n$, indicates the number of trials. C. Clark & L. Schkade, Statistical Analysis for Administrative Decisions 89, 93 (3d ed. 1979).

Absent illegal discrimination or the use of impermissible selection criteria, employment decisions and selection for service on a jury venire should approximate a Bernoulli process. The person hired will be either black or non-black. If racially neutral, the hiring or selection of one person should not affect whether the next person hired is black or not. Also, if the choices are made from the same pool of eligible persons without regard to race, the probability of choosing a black or a non-black is constant for each choice and should occur at random.

Moreover, in hiring unskilled labor and in drawing at random for service on a jury venire, both of the parameters of the cumulative binomial probability distribution are easily determined. The parameter representing the number of persons selected for employment or jury service, $n$, is known. The parameter representing the proportion of blacks and non-blacks in the eligible population from which the selections are made, $p$, is easily measured.

Because hiring unskilled labor and making random selections for jury service should resemble a Bernoulli process and both parameters of the distribution are determinable, the cumulative binomial probability distribution is often used by statisticians to demonstrate illegal discrimination in the selection process in those settings. When we examine a discrepancy between the racial make-up of the jurors or laborers chosen and the pool of eligibles, the explanation is between two alternatives: either the selection procedure was biased or the outcome was due to chance alone. If the discrepancy is so great as to occur only one time out of twenty, the .05 level, the courts infer that the disparity is due to an impermissible selection process. *See* D. Baldus & J. Cole, Statistical Proof of Discrimination §§ 9.02, 9.03 (1980).

In building its legal analysis on a statistical model based on the cumulative binomial probability distribution, the majority premise that the selection of grand jury foremen in Madison Parish resembles a Bernoulli process. They also premise that the value of the $p$ parameter is equal to .6, an eligible population composed of 60% blacks,[4] and that the value of the $n$ parameter is

---

**3.** A familiar example of the occurrence of one outcome affecting a subsequent outcome is the successive drawing of playing cards from a deck without replacing the selected card prior to the next draw. With a standard deck of 52 cards, the probability of choosing a black card, a spade or a club, on the initial draw is .5, or one out of two. Conversely, the probability of choosing a non-black card is also .5, or one out of two. If, however, the selected card is not returned to the deck, the selection of a card affects a subsequent drawing: the probability of selecting a black card (or selecting a non-black card) is changed. In this example, if a

non-black card is initially drawn from a deck of 52 and not returned, then the probability of selecting a black card on the next draw increases to .5098, or 26 out of 51. The probability of selecting a non-black card becomes .4902, or 25 out of 51.

**4.** As discussed in the text accompanying notes 6–7, *infra*, I disagree with the majority's assumption that the proportion of blacks in Madison Parish is the same as the proportion of eligible blacks qualified to be selected as a grand jury foreman.

equal to 31, the number of times a grand jury foreman was selected in Madison Parish. The majority then use the cumulative binomial probability distribution to show the extreme improbability of selecting thirty-one successive white grand jury foremen and conclude that "the record demonstrated the likelihood that [the petitioners] could prove facts entitling them to relief." 661 F.2d 506.

The selection of grand jury foremen in Madison Parish and throughout most of Louisiana has some resemblance to a Bernoulli process. A grand jury foreman is either black or non-black. The selection of a grand jury foreman from one grand jury venire does not significantly affect the selection of a foreman from a subsequent grand jury venire.[5] Because only one foreman is selected from each venire, the probability of choosing a black or a non-black is constant for each venire.

The similarity to a Bernoulli process, however, ends there. Because Louisiana has decided to select their grand jury foremen based on their qualifications to serve, there is nothing inherent in the selection of a Louisiana grand jury foreman that suggests randomness so that the racial make-up of the past thirty-one foremen should occur without any fixed pattern and statistically mirror the population at large. So, when the majority assume that absent racial discrimination the proportion of blacks who have served as grand jury foremen should be statistically equivalent to the black representation in Madison Parish, they take a step too far.

Louisiana law does not comtemplate the selection of the grand jury foreman at random. Rather, it places in the district judge the responsibility to select the most qualified person to serve. This scheme is demonstrated by the Code of Criminal Procedure. The Code provides that "the court shall select one person from the grand jury venire to serve as foreman." La.Code Crim. Pro.Ann. art. 413 (West 1967). By contrast, it then provides for the selection of the other members of the grand jury at random when it appoints the sheriff to "draw indiscriminately and by lot from the envelope containing the remaining names on the grand jury venire a sufficient number ... to complete the grand jury." Id.

This scheme of entrusting the selection of the foreman to the judge, so that the most qualified person on the grand jury venire may be chosen as foreman, while leaving the remainder of the grand jury to chance, is, in light of the responsibilities and powers of the grand jury, a legitimate choice for Louisiana to make. The Louisiana grand jury is a puissant body. It plays a key role in the instigation of criminal prosecutions by providing the accused with "an independent determination of *probable cause,*" *State v. Williams*, 310 So.2d 528, 533 (La. 1975) (emphasis in original), prior to returning a true bill, *see* La.Code Crim.Pro. Ann. arts. 443–444 (West 1967). In fulfilling its responsibilities, the Louisiana "grand jury may, on its own initiative, investigate any matter coming to its attention, from whatever source," *Hewitt v. Webster*, 118 So.2d 688, 693 (La.App.1960), and decide for itself the times and places of its meetings throughout the parish, La.Code Crim.Pro. Ann. art. 435 (West Supp.1981). It has the power to subpoena witnesses to appear before it. *Id.* art. 439 (West 1967). The willful failure of a person under subpoena to reappear before the grand jury as directed by the foreman may constitute contempt of court. *In re Grand Jury Subpoenas*, 363

---

**5.** In Louisiana the selection of grand jury foremen resembles, in part, drawing cards from a deck without returning the cards prior to the next draw. *See* note 3, *supra.* The Code of Criminal Procedure requires that the parish jury commission delete from the general venire, the venire from which the grand jury venire is drawn and the grand jury foreman is selected, the names of those persons who have served since the previous selection of the general venire. La.Code Crim.Pro.Ann. arts. 410, 411 (West Supp.1981); *see* La.Sup.Ct.R. 25, § 4 (West 1981). Thus, like the playing card previously drawn and not yet returned to the deck, it is possible that a few persons in the population may be ineligible for selection as the next grand jury foreman. This aberration is, however, statistically insignificant. M. Finkelstein, Quantitative Methods in Law 32 (1978).

So.2d 651, 655 (La.1978). To increase its effectiveness, Louisiana law provides that "the proceedings of the grand jury [are] cloaked in secrecy," *In re Grand Jury Subpoenas*, 387 So.2d 1140, 1141 (La.1980); *see* La.Code Crim.Pro.Ann. art. 434 (West Supp. 1981), and forbids a witness called before the grand jury to appear with counsel, 387 So.2d at 1142. *See generally* Comment, Selected Problems of the Louisiana Grand Jury, 52 Tul.L.Rev. 707, 719–31 (1978).

In sum, there is neither anything random about the process of selecting a grand jury foreman in Louisiana, nor any reason for the majority to indulge in the presupposition that the selection of grand jury foremen should, absent discrimination, produce random results. Louisiana has decided to choose the best possible person from the grand jury venire to serve as foreman. That determination alone refutes the assumption of randomness that underlies a Bernoulli process and disallows an inference of racial discrimination by statistically testing the numbers against the cumulative binomial probability distribution.

The majority violate another tenet of a Bernoulli process when they assume that a value of the $p$ parameter equal to the proportion of blacks in Madison Parish is the same as the probability of selecting a black for service as a grand jury foreman from each of the thirty-one grand jury venires. Even accepting the majority's baseless assumption that all persons in Madison Parish are equally eligible to be selected by the district judge as a foreman, the use of a $p$ equal to the percentage of blacks in the parish population is simply an improper use of statistics. Selections for grand jury foreman are made from the grand jury venire, *not* from the population of Madison Parish. Variability may exist between the proportion of blacks on the different grand

jury venires; variability also may exist between the proportion of blacks on the venires and in the parish population. The proportion of blacks on a grand jury venire is, of course, equal to the probability of selecting a black to serve as a foreman using a racially neutral selection process. Because these probabilities will differ from one venire to the next, however, the requirement of a Bernoulli process that the probability of an outcome remain constant throughout all selections is violated. Only with thirty-one separate values of the $p$ parameter, each equal to the proportion of blacks on one of the thirty-one separate grand jury venires, can any valid statistical calculation be made.

Moreover, there is simply no reason to believe, as the majority assume, that a value of $p$ equal to the proportion of blacks in the population of Madison Parish represents the probability of selecting a black from all of the thirty-one venires. Because Louisiana has decided to place the selection of the grand jury foreman in the district judge so that the most qualified person is selected, a sub-population of persons most qualified for service as a foreman exists on each grand jury venire. It is from this sub-population composed of veniremen who are eligible for selection as foreman that the $p$ parameter must be determined. We pointed this out in *United States ex rel. Barksdale v. Blackburn*, 639 F.2d 1115, 1124 (5th Cir. 1981) (en banc), when we said, "statistics describing the presumptively eligible black juror population, rather than the general black population, provide the proper starting point for an inquiry into racial disparities in the Parish [venires]." [6]

As applied to the instant case, *Barksdale* requires the petitioners to show the proportion of blacks, on each of the thirty-one

**6.** The use of a sub-population whose members each possess traits enabling them to be selected is also employed in testing for racial discrimination in employment. *Wilkins v. University of Houston*, 654 F.2d 388, 396 n.9 (5th Cir. 1981) (quoting *Hazelwood School Dist. v. United States*, 433 U.S. 299, 308 n.13, 97 S.Ct. 2736, 2741 n.13, 53 L.Ed.2d 768 (1977)) ("statistical challenges to a defendant's hiring practices for positions requiring special qualifications must be based not on comparisons with the general population but on comparisons with 'the smaller group of individuals who possess the necessary qualifications' "); *see also* Dorsaneo, Statistical Evidence in Employment Discrimination Litigation: Selection of the Available Population, Problems, and Proposals, 29 Sw. L.J. 859, 866–71 (1975).

previous grand jury venires, who were as qualified to serve as foreman as the most qualified person on the grand jury venire. Only with this data can the statistician determine the $p$ parameters to calculate the probability of the choice of thirty-one successive non-black grand jury foremen in Madison Parish. And this data is simply unknown and unknowable.[7]

Thus, the majority's calculation of an extremely small number to represent the probability of selecting thirty-one consecutive white grand jury foremen does not suggest the possibility that the petitioners have suffered from discrimination in the exclusion of blacks as grand jury foremen inasmuch as it reflects the use of an inappropriate statistical model. The consequences of the majority's decision reveal the error in their analysis. If, as in Madison Parish, thirty-one random selections for grand jury foremen are made from a population that is 60% black, the probability is one in 10,000 that less than nine blacks will be chosen; the probability is less than one in 2000 that less than ten blacks will be chosen; and the probability is one in 200 that less than twelve blacks will be chosen. The prima facie case is made if not more than thirteen blacks have served as grand jury foremen![8]

I end this statistical discourse as the majority ends theirs: declaring the inappropriateness of these statistics. They then fall back to opine that in these years, "absent racially discriminatory motivation ... [a] qualified black person could have been found and appointed" grand jury foreman. Majority opinion at 505. I regard this speculation as wide as their statistics from justifying an additional hearing for the petitioners. I would affirm the judgment of the district court.

JOHN R. BROWN, Circuit Judge, with whom TJOFLAT, Circuit Judge, joins, concurring and dissenting in part:

I concur in the result reached in Judge Rubin's opinion and all that is said with the exception of that portion contained in Part

---

7. We know absolutely nothing about the qualifications of the people on these several venires or on the venire from which the grand jury came that indicted the petitioners. In view of the peculiar responsibilities and demands placed on a foreman of a grand jury, it is nothing but wild speculation to assume that the absence of a black foreman was due to the systematic exclusion of blacks as grand jury foremen.

8. The cumulative binomial probabilities computed to the nearest .0001 by the MINITAB II statistical package, *see* T. Ryan, B. Joiner & B. Ryan, MINITAB Student Handbook 91–101 (1976), for 31 random selections ($n = 31$) from a population that is 60 percent black ($p = .6$) are as follows:

| Number of blacks chosen in 31 random selections ("k"): | Probability of choosing k or fewer number of blacks: |
|---|---|
| 1 | 0.0000 |
| 2 | 0.0000 |
| 3 | 0.0000 |
| 4 | 0.0000 |
| 5 | 0.0000 |
| 6 | 0.0000 |
| 7 | 0.0000 |
| 8 | 0.0001 |
| 9 | 0.0005 |
| 10 | 0.0017 |
| 11 | 0.0050 |
| 12 | 0.0135 |
| 13 | 0.0320 |
| 14 | 0.0677 |
| 15 | 0.1284 |
| 16 | 0.2194 |
| 17 | 0.3399 |
| 18 | 0.4805 |
| 19 | 0.6248 |
| 20 | 0.7546 |
| 21 | 0.8566 |
| 22 | 0.9262 |
| 23 | 0.9670 |
| 24 | 0.9874 |
| 25 | 0.9960 |
| 26 | 0.9990 |
| 27 | 0.9998 |
| 28 | 1.0000 |

The prima facie case at the .05 level is attained when the probability decreases from .0677 to .0320 as the number of blacks selected as grand jury foremen drop from 14 to 13.

VI expounding a statistical basis[1] for the result achieved.

Although I have long, ardently urged[2] the full development and use of statistics in demonstrating discrimination—usually racial—that method is not comparable and hence is not appropriate here. As to this I think the analysis of Judge Reavley in his dissent is unanswerable. These statistical constructs—by whatever name described—are based on the assumed fact that choice is determined wholly at random by *chance*.

Here, grand jury foremen—whether for good, acceptable or bad reasons—are to be selected deliberately by the Judge as a matter of individualized principled choice. The Judge does not—as the statistical model contemplates—draw at random a single name out of forty.

It flaws the opinion to stress this inapplicable statistical improbability as a basis for the result requiring remand to the Federal District Court to ascertain all of the facts concerning the process of selecting grand jury foremen which so far is only sketchily revealed in an incomplete, inadequate, State record.

---

**1.** This encompasses the following from the last part of the opinion, 661 F.2d 508, that reads:

That, from a venire selected in a racially nondiscriminatory manner in a parish where the population is approximately 60% black, there would be no racial discrimination in the selection of white foreman thirty-one successive times is so unlikely as to demand at least exploration [and is] an event whose occurrence is *statistically implausible* [which] occurs repeatedly, . . .?

**2.** *State of Alabama v. United States*, 304 F.2d 583 (5th Cir. 1962) *aff'd per curiam* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112:

In the problem of racial discrimination, statistics often tell much, and Courts listen.

*Rowe v. General Motors Corp.*, 457 F.2d 348, 357 (5th Cir. 1972); *Brooks v. Beto*, 366 F.2d 1, 9 (5th Cir. 1966), *cert. denied*, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967):

Figures speak and when they do, Courts listen." *United States v. Hinds*, 417 F.2d 852, 858 (5th Cir. 1969):

Statistics are not, of course, the whole answer, but nothing is as emphatic as zero. *United States v. T.I.M.E.-D.C.*, 517 F.2d 299, 313 (5th Cir. 1975); *Smith v. Liberty Mutual Ins. Co.*, 569 F.2d 325 (5th Cir. 1978).